## *In Re* ANDREW HALL.

1. Whether the Act of Congress of February, 1793, and its supplement the Act of 1850 (the "Fugitive Slave Act"), are in force in this District, *quære*—the Court being divided in opinion.
2. Whether the late Circuit Court of the District of Columbia was one of the class of circuit courts established by Congress under the judicial powers of the Constitution, or was a court erected under that provision which confers upon Congress the right of exclusive legislation over the District is a question discussed in this case but not determined.

Decided May 24, 1863.

HEARING on *habeas corpus.*

The relator, Andrew Hall, was arrested by the marshal of the District, on a warrant issued by Mr. Justice Wylie, at the instance of George W. Duval, a citizen of Maryland, who claimed him under the fugitive slave law as a fugitive from service. After his arrest Hall procured a writ of *habeas corpus,* and on the answer of the respondent a motion was made to discharge the relator on the ground that the Fugitive Slave Act was not in force in this District, and that the relator's arrest was consequently illegal. The case was heard before the full bench upon this motion.

MESSRS. WALTER S. COX and JOSEPH H. BRADLEY, for relator.

MESSRS. DEAN and JOLLIFFE, for respondent.

MR. CHIEF JUSTICE CARTTER delivered his opinion; as follows:

The Court is unable to agree in this case, being equally divided upon the motion to discharge the relator. All the members of the Court have experienced serious embarrassment in regard to this subject. It is my own conviction

that the power heretofore exercised in this District in the matter of fugitive slaves exists at the present time. In arriving at that conclusion I have treated this Court essentially as a Circuit Court of the United States, subject to all the legislation affecting such courts. I have treated it in this light, because taking the intendment of the Legislature, and the experience and precedents of the past as the law of judgment, I believe that in 1801 the Congress of the United States merged this Court in the family of Federal Courts to all intents and for all purposes. And from that time forward this Court, without denomination, became a Circuit Court, and all legislation relating to the Circuit Courts related to this Court.

It seems to me that the evident purpose of the tenth section of the act of 1850 was to arm this Court and the authority of the District, the judges and commissioners with the power and duty to execute this law. I do not intend, however, to elaborate any reason for my opinion, but simply to announce that it appears to me that the history of this legislation, the history of this Court, and the cotemporaneous construction of power by our predecessors, to a large extent affirmed by the Supreme Court, impose upon me the duty of carrying out this law, and whether that duty is a pleasant one or an unpleasant one, as far as I am concerned, is totally immaterial. While I sit here I shall perform my duty whatever may be the consequences. While I am honest in this conviction, two of my brethren are equally honest in the converse of the proposition, and perhaps can furnish better reasons for their opinions than I can for mine. For myself, I confess that my conclusion is the product of a conviction that it is the duty of a judge to carry out the manifest purpose of the law making power, and to seek in legislation his lights to that end, and to see that those purposes are executed. I have no doubt myself that under the Constitution, as far as the fugitive slave law is concerned, it was the purpose to protect those who

claimed ownership in slaves in this District as much as it was anywhere else. I have no doubt that the legislation that has followed had that purpose in view. Being satisfied of that fact, my own judgment would be a refusal to grant the motion. Brother Fisher concurs with me in this judgment, and Brothers Olin and Wylie dissent from it, and they will give their own reasons.

MR. JUSTICE WYLIE said:

The constitutionality of the Act of 1793, and of its supplement of 1850, I regard as settled by the Supreme Court.

The questions which I regard as open for examination are:

1. Whether these acts, or either of them, is applicable to the District of Columbia?

2. If applicable, was the justice who issued the warrant of arrest in this case lawfully authorized to issue it?

If either of these acts is not now in force in this District, or, if the justice of the Supreme Court of this District was not authorized by law to issue the warrant of arrest in this case, the relator must be discharged. If, on the other hand, the warrant was properly and lawfully issued, he must be restored to the claimant.

In Section two, of Article four, of the Constitution, it is declared, "That no person held to service or labor in one State, under the laws thereof, escaping into another shall, in consequence of any law or regulation therein be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due."

As none but the States are members of the Union, and the Constitution only goes into effect upon a people after they are admitted into the Union as a State, this provision of the Constitution was limited (as indeed are all its provisions) to operations between the States alone.

But as Congress and the Executive possess the constitu-

tional power to make laws for and govern the Territories which belong to the Union, but are not yet members of it, the Act of February 12, 1793, entitled "An act respecting fugitives from justice and persons escaping from their masters," in its third section provides " That when a person held to labor in any of the United States, *or in either of the Territories* on the northwest or south of the river Ohio, under the laws thereof, shall escape into any other of the said States or Territory, the person to whom such service or labor may be due, his agent or attorney, is hereby empowered to seize or arrest such fugitive from labor, and take him or her before any judge of the Circuit or District Courts of the United States, residing or living within the State, or before any magistrate of a county, city, or town corporate wherein such seizure shall be made, and upon proof," &c., the claimant shall obtain a certificate to enable him to remove the fugi-- tive to the State or Territory from which he or she fled.

Under this law, if the fugitive was captured in a State the certificate might be given by a judge of either the Circuit or District Court of the United States; but neither of these officers could grant the certificate if the capture was made in a Territory. In that case, the certificate was to be given by some magistrate of a county, city, or town corpor- ate wherein the seizure or arrest was made. The reason for this distinction was that Congress knew there could be no Circuit or District Court of the United States except within the limits of the States embraced by the Constitution and under the Constitution. The system of Circuit and District Courts of the United States had been provided by the judi- ciary act of 1789, and embraced only the States; that con- tinues to be our system to this day without change, except that the number of the courts of both kinds has been in- creased with the growth of the country. As yet the Dis- trict of Columbia had no existence, and the territory which it now embraces was a part of the State of Maryland. But its acquisition had been provided for, and its political con-

dition fixed in advance by section eight of the Constitution, which confers upon Congress the power " to exercise exclusive legislation in all cases whatever over such District (not exceeding ten miles square) as may by cession of particular States and the acceptance of Congress become the seat of Government of the United States."

By Act of 27th February, 1801, the government assumed the possession of and jurisdiction over the territory which had been ceded by the States of Maryland and Virginia respectively for the seat of government. The laws of Maryland, which had been previously in force in that part which was ceded by her, and the laws of Virginia which had been previously in force in that part which was ceded by Virginia, were respectively continued in force. A court was erected in said District of Columbia and consisted of three judges, one denominated the chief judge, and the other two assistant judges, who were to hold their offices during good behavior. And the said court and the judges thereof were invested with all the powers by law vested in the Circuit Courts and the judges of the Circuit Courts of the United States.

This Court also had cognizance of all crimes and offenses committed within the District, and of all cases in law and equity between parties, both or either of whom shall be resident or found within the District, and also of all actions or suits of a civil nature at common law or in equity in which the United States shall be plaintiffs or complainants, and all penalties and forfeitures made, arising, or accruing under the laws of the United States.

The act further provided that this court should continue to take cognizance of all actions, suits, &c., which were then pending respectively in the Hustings Courts of Georgetown and Alexandria wherein the sum in controversy amounted to twenty dollars exclusive of costs.

Finally, all process was to be tested in the name of the chief judge.

Six days after the passage of the above-mentioned act a supplementary act was passed, which conferred upon the court the power to appoint constables, inspectors of tobacco and flour, and surveyor, jurisdiction as to mills, highways, and ferries, &c., and in Alexandria County the same jurisdiction, civil and criminal, as is now (then) possessed and exercised by the District Courts of Virginia.

All these provisions are convincing proof that the Court thus constituted was a local Court of general and universal jurisdiction in all controversies between the citizens of the District and others in civil matters involving the sum of twenty dollars and upwards, and in criminal matters exercising jurisdiction over the most trivial misdemeanors.

It is true that it also possessed the powers and jurisdiction of the Circuit Courts of the United States.

But in passing the Act of 27th February, 1801, Congress seems to have forgotten to provide for the case of fugitives from justice and fugitives from service or labor. The act of 1793 could apply only to States and to the Territories northwest and south of the river Ohio.

The District of Columbia was a new creation, and was neither a *State*, in which it was lawful for a circuit or district judge to examine the case of the fugitive from labor, nor was it one of the *specified Territories*. There was, then, no provision made in the law for this case.

This omission was attempted to be supplied by the sixth section of the Act of 3d March, 1801, in these words:

"That in all cases where the Constitution or laws of the United States provide that criminals and fugitives from justice, or persons held to labor in any State, escaping into another State, shall be delivered up. The Chief Justice of the said District shall be, and he is hereby, empowered and required to cause to be apprehended and delivered up such criminal, fugitive from justice or persons fleeing from service, as the case may be, who shall be found within the District, in the same manner and under the same regula-

tions as the executive authority of the several States are required to do the same; and all executive and judicial officers are hereby required to obey all lawful precepts, or other process, for that purpose, and to be aiding and assisting in such delivery."

This act, then, was the first to introduce into the District of Columbia a law for the recapture of fugitives from crime and fugitives from service. The functions to be exercised by the Chief Justice of the District in the case of fugitives from justice are plain and clear; but in the other case, that of fugitives from service, it most obscure, and nearly, if not quite, unintelligible. In both cases the duty enjoined is required to be performed *"in the same manner and under the same regulations as the executive authority of the several States are required to do the same,"*

The most reasonable and natural interpretation seems to be that reference is made to that provision of the act of 1793, which confers the power upon any magistrate of a city or town corporate wherein the seizure is made, to examine the proofs of claims to the fugitive, and grant certificate, &c.

If the Circuit Court of the District of Columbia be a constitutional Criminal Court of the United States, and the duty thus imposed upon the Chief Justice of this District be simply an executive or ministerial function, this provision of the law is simply void; for, as we shall see hereafter, it has been emphatically and repeatedly decided that Congress possesses no constitutional power to require of the judges of the Federal Courts the performance of duties of an executive character.

But if the Circuit Court of this District was not a constitutional Federal Court, like the Circuit and District Courts of the United States, but a court of general jurisdiction in all matters of controversy in law and equity, a District of Columbia Court, established under that provision of the Constitution which confers upon Congress exclusive juris-

diction over this District in all cases whatsoever, then the result would be different. For by virtue of this general power it was competent for Congress to constitute the Court as it thought proper, without regard to the restriction of the Constitution in respect to Courts of the United States, and might impose even the performance of executive duties upon any of its judges. This subject will be further considered in a subsequent part of this opinion.

It is a remarkable fact that at the time of the passage of this act there was no such officer as a Chief Justice of the District of Columbia.

Nor has there ever been to this day an officer so designated. There was a Chief Judge of the Circuit Court of the District of Columbia; and that officer, assuming, no doubt correctly, that the law was intended to apply to him, continued to perform the duties thereby prescribed from the date of the passage of the law, on the 3d of March, 1801, till the Court was abolished by the recent act establishing the present Supreme Court of the District of Columbia. During that long period of sixty-two years, those duties were performed first by the late Chief Judge Cranch, and after his decease by his successor in office, Judge Dunlop; but, as I am informed by experienced members of the bar of this District, these judges never interfered under this law, except when the fugitive from labor was brought before them by his claimant on *habeas corpus*. And even these cases were few; for slavery being the law of this District, and by both the surrounding States, it was the general practice that the owner of the slave seized him when found, and carried him home without resorting to any process of law for that purpose; and, in so doing, incurred no risk, and was put to but little expense or inconvenience. Assuming that, by fair construction, the sixth section of the Act of 3d of March, 1801, was effectual to introduce the Fugitive Act of 1793 into this District, and impose the obligation of surrendering fugitives from crime and from labor

*3*

upon the Chief Judge of the late Criminal Court of this District, we come now to inquire whether, by the Act of 18th of September, 1850, supplementary and amendatory of the Act of 1793, and the Act of 3d of March, 1863, establishing this Court, this power and duty which had been previously exclusively vested (if at all) in the Chief Judge of the Criminal Court of the District of Columbia, were so equally imparted to and enjoined upon the other judges of the late Criminal Court, and their sucessors, the justices of this Supreme Court.

The act of 1850 consists of ten sections. The first nine sections apply distinctly and exclusively to the States and organized territories of the United States, and have no relation whatever to the District of Columbia.

These nine sections provide a machinery of commissioners for the said States and organized territories for the recapture of fugitives from labor; and these commissioners are to be appointed *in the States*, by the Criminal Court of the United States, and *in the territories* by the several superior courts thereof.

And it is provided that these commissioners—that is to say, the commissioners appointed by the Circuit Court of the United States within the several States, and the commissioners appointed by the superior courts within the several organized territories—"shall have concurrent jurisdiction with the judges of the circuit and district courts of the United States, in their respective circuits and districts, *within the several States*, and the judges of the superior courts of the territories, severally and collectively, in term, time and vacation."

This language leaves no room for any difference of opinion as to what courts and judges and what commissioners are authorized to act under the law. There is no reference in the remotest manner to either courts, judges or commissioners in the District of Columbia. On the contrary, the language appears to have been carefully selected to exclude them all.

Let us now consider the tenth and last section of the law—the only section which relates to this District, or in which it is named. The section is longer than I care to quote, but is in substance as follows:

That when any person held to service or labor in any State or territory, or in the District of Columbia, shall escape therefrom, the party claiming the service of the fugitive may have a record made in the place from which the escape was made, proving his right to the fugitive, and taking with him a transcript of this record, and on the same being produced "in any other State, territory or district in which the person so escaping may be found, and being exhibited to any judge, commissioner or other officer *authorized by the law of the United States to cause persons escaping from service or labor to be delivered up,*" this record shall be held and taken to be full and conclusive evidence to establish the owner's claim.

"And the said Court, commissioner, judge, or other person authorized by this act to grant certificates to claimants of fugitives," shall thereupon grant a certificate to the claimant, to enable him to seize and arrest the fugitive and transport him to the State or Territory from which he escaped.

If it were clear that the previous nine sections of this act conferred no power upon the judges of the Circuit Court of this District, either to act themselves, or to appoint commissioners to act, under their provisions it is equally clear that no new power was conferred in these respects by the tenth section. The record is to be carried by the claimant to some judge, commissioner, or other officer *authorized by law* to investigate the subject and give a certificate. If reference is here made to the officers provided for this purpose, in the nine previous sections of the act, there is not one of them an officer or magistrate in this District; they are only the judges of United States Courts within the States, and commissioners within the States or organized Territories.

Nor is this argument in the slightest degree weakened by the next following sentence, except one, in the same section, which is as follows:

"And the said Court, commissioner, or judge, or other person authorized by *this act* to grant certificates to claimants of fugitives shall, upon the production of the record and other evidences aforesaid, grant to such claimants a certificate," &c.

This sentence, without any distortion or strained construction, especially when taken in connection with the first sentence of the section, might be construed to mean that no judge or other officer, except those previously provided in the act, should have the power to examine the claims or grant certificates. If that were the reading, then no fugitive cases could be examined, except in the States by the United States judges, and in the Territories by commissioners; so that this tenth section, so far as it concern this District, would then be construed to apply only to cases of fugitives who had escaped from the District, and not to cases where fugitives had escaped to it.

But it has been argued with great earnestness and apparent sincerity, that the late Circuit Court of this District was included in the terms of the act of 1850, as one of the Criminal Courts of the United States. And indeed the exigency of the occasion requires that this position be maintained, else has this Court nor its judges any jurisdiction under the act of 1850, either to act themselves, or appoint commissioners with authority to act under this law.

In my opinion, the late Criminal Court of this District was not one of the class of Criminal Courts of the United States. But I will not at present argue that subject; but will admit, for the sake of the argument, that it was one of that class of Courts. It is, nevertheless, not embraced by the act of 1850. That act, as has been already shown, is confined to the several Courts and District Courts of the United States *within the States*. This is manifest from the

language of the fourth section: "That the commissioners above named shall have concurrent jurisdiction with the judges of the Circuit and District Courts of the United States, in their respective circuits and districts *within* the several States, and the judges of the Superior Courts of the Territories, severally and collectively, in term time and vacation."

No other Circuit Courts of the United States, therefore, are within the meaning of this act, except only such whose judges exercise their jurisdiction "*within the several States.*" So that, if the late Circuit Court of the District was indeed and truly a Circuit Court of the United States, that fact would make no manner of difference as to the subject under examination. But was the late Circuit Court of the District of Columbia one of the class of Circuit Courts of the United States, established by Congress under the judicial powers of the Constitution; or was it a Court of a different character, erected under that power in the Constitution which confers upon Congress the right of exclusive legislation over the District of Columbia?

It is very probable that but for the similarity of names, this question would never have been made. And yet even the names are not the same. There were about as much propriety in maintaining that the Supreme Court of the District of Columbia is a Supreme Court of the United States, as for arguing that the Circuit Court of the District of Columbia was a Circuit Court of the United States.

It is quite true that Congress by the act of 27th of February, 1801, invested the Court with all the powers, and also with all the jurisdiction then possessed by the Circuit Courts of the United States. But at the same time it conferred upon the Court jurisdiction over all the controversies which might arise between our own citizens; inhabitants of the same district, over subjects of even the value of $20, over appeals from the Orphans' Court, even over many matters such as the appointment of constables, inspectors of flour

and tobacco, and in general, all the powers and jurisdiction which were possessed by the courts of Maryland and Virginia.

Now it must be manifest that no court established under the judicial provisions of the Constitution, as are the Circuit Courts of the United States, is capable of receiving any such jurisdiction as that I have referred to. The correct doctrine is laid down by Chief Justice Taney, in the case of Dred Scott *vs.* Sanford, 19th How., at page 401, as follows: "This difference arises, as we have said, from the peculiar character of the Government of the United States. For although it is sovereign and supreme in its appropriate sphere of action, yet it does not possess all the powers which usually belong to the sovereignty of a nation. Certain specified powers, enumerated in the Constitution, have been conferred upon it, and neither the legislative, executive, nor judicial departments of the government can lawfully exercise any authority beyond the limits marked out in the Constitution."

And in regulating the judicial department, the cases in which the courts of the United States shall have jurisdiction are particularly and specifically enumerated and defined; *and they are not authorized to take cognizance of any case which does not come within the description therein specified.*

A Circuit Court of the United States is, therefore, not competent to exercise jurisdiction over any parties or subject of controversy, unless they are specifically included in the class enumerated in the 3d Article of the Constitution.

But the cases arising under that branch of its jurisdiction compose but a small proportion of the business which is brought before the Court of this District. Either all this vast amount of business over which this Court has exercised jurisdiction for more than sixty years, and mainly for the accommodation of which the Court was enacted, has been transacted in the Circuit Court of the United States, which possessed no constitutional cognizance of it at all,

and whose judgments and decrees are, therefore, in all these cases void; or, the other branch of the alternative is true, namely: that our Circuit Court is a Court for the District of Columbia, and its jurisdiction is supplied and is sustained from that provision which confers upon Congress the right of exclusive legislation over the District of Columbia.

These principles are plainly assumed, although the precise question was not decided in the case of American Insurance Company *vs.* Canter, 1 Peters, 511, and in Kendall *vs.* The United States, 12 *Ib.*, 524.

In this last case, the facts, so far as they are important in this question, were these: On the 13th day of February, 1801, Congress passed a law for a new organization of the circuit courts of the United States, and conferring the power on these courts of issuing the writ of *mandamus* in certain cases—a power which these courts did not previously possess. On the 27th of February, 1801, the act was passed erecting the Circuit Court of the District, and vesting it with all the powers and jurisdiction possessed by the circuit courts of the United States, including, therefore, the power to issue the writ of *mandamus*. The new organization lasted but little more than a year, and the Act of 13th February, 1801, was repealed by the Act of March 8, 1802. The effect of this renewal was to revive the old law which was in force prior to 13th February, 1801, the act of 1789. But this act did not confer upon the circuit courts the power to issue the writ of *mandamus*. Thus the power which these courts gained by the Act of 13th February, 1801, they lost by its repeal. But the Court decided, in this case, that the Circuit Court of the District of Columbia still possessed the power to issue the writ, and its jurisdiction, in this respect, was unaffected by the passage of the act which deprived the circuit courts of the United States of that power.

This opinion is already drawn to greater length than I

intended it should be; but its length is not incommensurate with the importance of the questions discussed, or of their interest to the profession and the country. I have not stopped to meet and discuss a number of questions of secondary consequence, knowing that they were but secondary and would stand or fall with the fate of those of primary importance. These, although only partially discussed, yet I presume, have been examined sufficiently to show that the conclusions reached are unquestionably the law.

If the sixth section of the Act of March 3, 1801, was at all obligatory upon the Chief Judge of the late Circuit Court, as the person designated as Chief Justice of the District of Columbia, to execute the law, yet it did not confer any such power on his associate judges; nor have the justices of this Court, other than the Chief Justice, any power or authority under that law. In my judgment, the relator is unlawfully detained, and ought to be discharged.

MR. JUSTICE FISHER said:

I was not present last week when my brethren announced their opinion* as to the first question involved in this case. I refer to the question as to the constitutionality of the several acts of Congress providing for the recapture and delivery of fugitive slaves. I, therefore, avail myself of this occasion to declare my entire concurrence in the opinion then expressed, that whatever might be the views of this Court upon that subject were it a new question, we are bound to acknowledge the decisions of the highest judicial tribunal of the Republic as the supreme law of the land.

The Supreme Court of the United States has more than once passed upon that question, and it only remains for inferior tribunals to accept the law as it is thus declared. "*Stare decisis*" is a maxim of the law as salutary as it is ancient, and should never be disregarded except in cases where

---

*These opinions were oral, and, consequently, have not been preserved.

the safety of the State or clear and pressing public necessity demands a departure from its guidance.

I concur with Chief Justice Cartter in the opinion just expressed upon the questions presented in the argument of this cause. In giving construction to the several acts of Congress enacted for the purpose of aiding in the execution of that clause in the Constitution which requires the extradition of slaves escaping from one State into another we are to regard those acts being *pari materia* as one act; and we are also, in making inquest for the meaning of the acts, to be governed by what appears to be the purpose of the legislature. Taking then, all these enactments together, I cannot understand how any man can fail to perceive in them a manifest purpose on the part of Congress, not only to provide for the return of a slave escaping from one State into another State, but to provide for the return of a slave escaping from this District into a State or a Territory, or another district; and further, for the return of a slave escaping from a State, a Territory of another district, *into* this District. The District of Columbia is by no means "*casus omissus*" in the statute. The tenth section of the Act of 1850, if we were to look no further, expressly declares "that when any person held to service or labor in any State or Territory, or in the District of Columbia, shall escape therefrom, the party to whom such service or labor shall be due, his, her, or their agent or attorney may apply to any Court of record therein, or judge thereof, in vacation, and make satisfactory proof to said Court, or judge in vacation, of the escape aforesaid, and that the person escaping owed service or labor to such party; whereupon the Court shall cause a record to be made of the matters so proved, and also a general description of the person so escaping with such convenient certainty as may be, and a transcript of such record, authenticated by the attestation of the clerk and of the seal of the said Court, being produced *in* any other State, Territory, or *district* in which the person so escaping may be, and

*4*

being exhibited to any judge, commissioner, or other officer authorized by the law of the United States to cause persons escaping from service or labor to be delivered up, shall be held and taken to be full and conclusive evidence of the fact of the escape, and that the service or labor of the person escaping is due to the party in such record mentioned; and upon the production by the said party of other and further evidence, if necessary either oral or by affidavit, in addition to what is contained in said record of the identity of the person escaping, he or she shall be delivered up to the claimant."

In order to free the section from confusion, and the more readily and clearly to get at the meaning of its provisions, let us leave out all occurring after the word "State," in the second line, down to the word "Court," inclusive, in the twelfth line, and let us substitute for the words thus omitted other words more briefly expressive of the same idea. We may do so without in anywise changing the sense or affecting the question under consideration, while we shall bring in close juxtaposition the first line and a half with that portion of the section beginning with the twelfth line. We then have the section to read as follows:

"That when any person held to servive or labor in any State shall escape therefrom, the claimant of the fugitive may make record proof of his claim in any Court in his own State; and a transcript of such record being produced in any other State, Territory or *district* in which the person so escaping may be found, and being exhibited to any judge, commissioner or other officer authorized by the law of the United States to cause persons escaping from service or labor to be delivered up, shall be held as full and conclusive evidence of the escape," &c.

The section there provides for the delivery of the fugitive to his master. Is Maryland then a State? Was the relator a person held to service or labor in that State? Has he escaped from that State? Is the District of Columbia a

district? And has the relator been found in this District? These questions, answered affirmatively, as they must be, leave no room to doubt of the application of the act of 1850 in this case. To my mind, it seems that words could not possibly be used more expressly indicative of the manifest intention of Congress to provide for the return of fugitives from a State, escaping into and found in this District, than those which they did use. The language could not have been more significant of their intention if they had declared in so many words that a slave escaping from Maryland, and found in the District of Columbia, should be liable to arrest and delivery, as provided for in the preceding sections of the chapter. It will not do, as an escape from the plain meaning of the words used in the tenth section, to say that the word "other," used in the twelfth line of that section, refers back to the words "District of Columbia," in the second line, so as to make an arrest and delivery in some other District than that of Columbia lawful; for such a construction would take away the right of recaption when the slave should escape from a State into any other place than *another State,* or from a Territory into any other place than *another Territory,* or from the District of Columbia into any other place than the District of Columbia (there being no other district at present within the limits of the Federal Government). So strained a construction would attribute to Congress a ridiculous absurdity, while the plain and natural construction which I give to the language of the section, makes sensible provision for the remedying of that which the Congress of 1850 deemed to be a defect in the pre-existing law on the subject. Entertaining this view, I am forced to the conclusion that the Fugitive Slave Law is applicable to the District of Columbia, as well in respect to slaves escaping *into* it from other States, Territories or districts where they may be lawfully held in slavery, as in respect to slaves escaping *from* this District into other States, Territories or districts prior to the passage of the Act

of April 16, 1862, emancipating the slaves within the limits of the District of Columbia.

The only question then remaining is as to whether there is any power vested in this Court, or the judges thereof, to execute the Fugitive Slave Act with respect to slaves escaping into this District; and the solution of this question depends upon the fact as to whether this Court, by the act authorizing it, has had conferred upon it the powers which belong to the Circuit Courts of the United States. In other words, does this Court belong to, and is it included in the family of Circuit Courts of the United States?

By the act organizing this tribunal, the Supreme Court of the District of Columbia has been clothed with all the powers and duties of the Circuit Court originally created by Congress for this District. This last Court was a creature of the Government of the United States, and not of any State government, and was styled a "Circuit Court." It was invested with all the potentiality and even more ample power than the Circuit Courts of the United States within the several States. How, then, could it have been other than a United States Circuit Court?

. But besides this we have the construction of the legislative, executive and judicial departments of the Government, all regarding the old Circuit Courts of this District as a United States Circuit Court. The rules made by the Supreme Court of the United States, to be observed by Circuit Courts of the United States, have been held by the Supreme Court to be applicable to the old Circuit Court of this District. Congress has passed enactments taking it for granted that it was a Circuit Court of the United States, and the Executive Departments have since its creation regarded it as in the category of United States Circuit Courts. Such recognitions would, even if there was a doubt about the question in the beginning, entitle it, after a lapse of half a century, to be considered as set at rest.

It is to the Circuit Courts of the United States, the judges

and commissioners thereof, upon whom is devolved the duty of executing the provisions of the Fugitive Slave Law of 1850.

I am clear, therefore, in my conviction—

*First.* That this Court is bound to accept the decisions of the Supreme Court of the United States declaring the Fugitive Slave Acts to be constitutional.

*Second.* That said acts being constitutional, are applicable to the District of Columbia, as well as to the States and Territories, so far as respects the recaption of slaves escaping from States when they are lawfully held as slaves; and—

*Third.* That this Court or any of its judges or commissioners are empowered to execute the Fugitive Slave Law of 1850.

As a consequence, I am of opinion that the relator ought to be remanded to the custody of the marshal, that the claimant may have a hearing of his claim before Judge Wylie, who issued the writ for the relator's arrest.

MR. JUSTICE OLIN said:

I greatly regret finding myself compelled, on a somewhat hasty examination of this question, to dissent from the opinions expressed by the Chief Justice and Associate Justice Fisher.

Up to and including 1850, there were but three acts of Congress passed in reference to the subject of the rendition of fugitive slaves. First, the act of 1793; second, the act of 1801, in reference to the Chief Judge of this District, and third, the law known as the Fugitive Slave Act. I am unable to discover that the provisions of either of these acts, except the act of 1801, refer to this District, or empower any officer, except it may be a justice of the peace, to execute its duty. The act of 1793 does not by its terms refer to the District, but, on the contrary, by its express language, the exercise of the authority conferred is limited

and confined to the rendition of slaves who escape from one State to another, or Territories northwest and south of the Ohio River. That act conferred powers on the Circuit and District Courts of the United States, and on the judges of those courts, and some other persons assumed to be State officers, whom it is not necessary to mention in this connection; and as it could not be held that that power had been conferred here by any other act, it is only necessary to see if this District was intended to be included within the terms of its provisions.

In construing this statute I confess that I have adopted the rule that unless the power is plainly given and jurisdiction expressly conferred, tho Court has no right to take it by implication. It is the duty of the Court to construe this statute strictly (it being in derogation of natural rights), and if the power is not plainly given it is not the duty of the Court to devise by ingenious modes of construction a means to the exercise of that power. I think it can hardly be assumed, therefore, that the act of 1793, by the mere designation of the judges of the District and Circuit Courts of the United States (tribunals well understood and defined at that time and up to the present hour), conferred the like authority to the judges of this District as was granted to those courts. I infer this from the act of Congress very soon thereafter passed, and about as soon as Congress assumed jurisdiction over and the government of this District, viz, the act conferring authority upon the Chief Judge of the then Circuit Court. I see no propriety—no reason for the passage of that act, unless it is to be taken as a legislative expression that up to that time the authority did not exist; for it would be an idle exercise of power if the authority to restore fugitive slaves from the District were already vested, not only in the Chief Judge, but in both of his associates. I infer that Congress thought there was no authority, no person designated for the exercise of that power, and consequently passed the act of 1801, conferring

the power upon persons in this District to exercise the office.

Thus the law stood until 1850. In the meantime a variety of commissioners had been appointed, not only by the District, but by the Circuit Courts of the United States; the power to appoint them was vested either in the District or in the Circuit Courts of the United States. And as I understood it, the language referring to that system of judicial courts established under the Constitution and extending their jurisdiction over the State is explicit and definite, and properly designated those courts, and in my judgment, should be restricted in its operation to those courts.

By the Fugitive Slave Law of 1850, the power to restore all these fugitive slaves was conferred upon these commissioners, and it is unnecessary to inquire here whether this court had or had not the power to appoint commissioners, and whether those commissioners, when appointed, may not exercise the jurisdiction which it is claimed here the judge ought to exercise in this case. I will give no opinion on that question, as I have not sufficiently examined it, and as it does not necessarily arise in this case. The question here is simply "whether the judge who issued this warrant of arrest had power to do so under the laws of Congress in reference to the rendition of fugitive slaves."

It is sought to discover this power in the act of 1850. After the most patient examination of it within the limited time I have had to devote to it, I am unable to discover any authority in the act of 1850 conferring any power upon the judge of this District, either of the present court or the court which went out of existance upon the institution of the present one.

I wish to call attention in this connection to the fourth section of the Fugitive Slave Law of 1850, which is as follows:

"The commissioners above named shall have concurrent jurisdiction with the judge of the Circuit and District Courts

of the United States, in their respective circuits and districts within the several States, and the judge of the Superior Court of the Territories, [as before spoken of as the organized territory] severally and collectively in term time and vacation, and shall grant certificates to such claimants upon satisfactory proof being made," &c.

That phrase, "grant certificates," is expressive when taken in connection with the tenth section of the act under which it is sought to confer the power upon this Court.

Without reading the whole of the tenth section, I will endeavor to state the substance of it so as to make myself understood. The tenth section provides, in the first place, that whenever a fugitive slave escapes, from this District for example, the claimant may apply to any Court of record in this District, or any judge thereof, and make up what is called the record of escape, which shall contain three things :

First, the fact that the slave has escaped out of the District without the consent of his master.

Second, that such a slave owes service to the claimant, and—

Third, such other facts as shall tend to prove the identity of the slave claimed as the person owing service to the claimant.

And on this third branch, this record is open to dispute and denial or controversy only before the person or Court to whom the claimant appealed for the service mentioned in the fourth section of the act. The claimant need not go to a Federal Court; he may go to any State Court, any Court of record, to get that record made up. To whom may he produce the record? The law says he may produce it to the person authorized by the law of the United States to render these slaves up. Who are those persons? By the Act of 1793, and by this act, they are commissioners appointed by the Circuit or District Courts of the United States or the judge of such a Circuit or District Court, or that Court;

and they are to render up the person if he be arrested and brought before such a tribunal as that.

The statute further goes on to say: "Where the proofs are defective as to the identity of the slave, he may furnish oral proof to supply that defect, and instead of the record he might seize the person and bring him before the person authorized to render up fugitive slaves." And the section further proceeds to say: "And the said Court, commissioners, judges, or other persons authorized by this act to grant certificates to claimants of fugitives owing service or labor as aforesaid, shall make certificate." Who are those persons authorized of this act to make certificate? They are the judges of the Circuit and District Courts of the United States, and the commissioners appointed by such Courts. The whole question then is whether the language here made use of in speaking of the judges of the District and Circuit Courts of the United States by its terms includes the judges of this District and the District or Circuit Court of this District?

I may remark in this connection, that the terms of the Act of 1801 which conferred upon the chief judge of this District the authority to render up fugitives from service and labor, when the act creating this Court abolished that Court, and with it the office of judge of the Circuit Court, and the person holding that position went out of office as he did by the act referred to; that power, whatever it was, which was conferred upon the chief judge of that Court, was not transmitted to this Court nor to the chief justice of this Court because the designation of one of the judges of this Court as chief justice or presiding judge carried with it no other authority in law, in my judgment, than that of presiding in the Court when the Court is assembled as a Court. It is the designation modified somewhat in form, known to the organization of Courts since the history of the common law, and it never was, unless some power was conferred by statute, incident to the power of chief justice. The simple

designation of the presiding judge or chief justice, confers upon that dignitary no judicial power above that conferred upon his brethren.  It simply authorizes him to preside at General Term when the Court meets.

Therefore, I think that the power conferred by the act of 1801 was repealed by the act of Congress which abolished the court and the officer upon whom the power was conferred.  It will be seen, then, that the only question is whether the general legislation of Congress affecting what is known as the Circuit and District Courts—that general judiciary system extending all over the United States, naming those courts by their then proper designation, applies to this court?  I do not doubt it does, although this court may possess, and I will concede, for the sake of the argument, it does possess all the power and jurisdiction of the various Circuit Courts of the United States by the act creating it, possesses all the powers that they then possessed, but even then I do not think it follows, by any means, that because this Court possessed all those powers it is identical with those courts, and that all the general legislation affecting those courts applies to this Court.  It is quite manifest that the courts are quite distinct and of entirely different jurisdiction and power.  For instance, the Court of this District, the late District Court not only possessed the powers that were originally given to the circuit courts of the United States, but it possessed, too, all those powers that were usually exercised by a court of equity—a court of law of the respective States—and it would be most extraordinary, if a court possessed of such powers should always be affected by legislation applicable only to the District and Circuit Courts proper of the United States.  It seems to me manifest that that is not so.  The case of Kendal, in 12th Peters, which has been cited in the argument clearly shows that the powers of this Court, as a Circuit Court, are different from the powers of a Federal Circuit Court, because the Court has repeatedly denied the

exercise of the authority of the Federal Courts to grant a writ of *mandamus;* but a majority of the Court sustained the view of the question, that this Court had the power to do it, and it derived this power, not from the general powers and authorities conferred upon the Circuit Courts of the United States, but from the laws of Maryland and the act of 1801, which was not repealed by the subsequent legislation affecting the organization of this Court.

I come to the conclusion, therefore, with entire willingness to execute every duty imposed upon me by law, as I am enabled to understand it by the best lights that are spread before me, that there is by the repeal of the act of 1801, or rather by the abolition of the Court that then existed, since 1801, up to the last session of Congress no power in this District, no judge in this District, except it be a justice of the peace, or some other officer, created here by some local authority, that may exercise this power. Perhaps the judge who issued the warrant may, if he sees proper to do so, voluntarily assume to exercise this power, though I can find no language in any statute of Congress authorizing him to do so, for he is not one of the officers named in the act of 1793. But it is possible that where Congress has conferred the power upon the State officers, if he is willing to exercise that authority he may do so. But I do not consider that question at all. I am only inquiring, in whom has the law reposed this duty when called upon to act in such a case as the present, and I have come to the conclusion that the judge who issued the warrant of arrest was not one of those officers, under the law of Congres, upon whom that duty had been imposed.