### ERIE R. CO. v. THE CORNELL NO. 2 et al.

### THE NO. 289.

### THE CORNELL NO. 20.

### THE ERIE NO. 258.

### THE FRANK COONEY.

District Court, S. D. New York.

Jan. 14, 1947.

Adhered to on Rehearing Feb. 19, 1947.

Hagen & Eidenbach, of New York City (Henry C. Eidenbach, of New York City, of counsel), for Erie R. Co.

Foley & Martin, of New York City (John R. Stewart and Christopher E.

Heckman, both of New York City, of counsel), for petitioners.

Kirlin, Campbell, Hickox & Keating, of New York City (Robert S. Erskine, and John H. Hanrahan, both of New York City, of counsel), for Tug Cornell No. 20.

Macklin, Brown, Lenahan & Speer, of New York City (Richard S. Leahy and Leo F. Hanan, both of New York City, of counsel), for Central R. R. of New Jersey.

Davies, Auerbach, Cornell & Hardy, of New York City (George Biernesser, of New York City, of counsel), for New York Dock Co.

George A. Garvey, of New York City, for Jarka Corporation.

Burlingham, Veeder, Clark & Hupper, of New York City (Stanley R. Wright, of New York City, of counsel), for Pennsylvania R. Co.

HULBERT, District Judge.

The trial of these causes was commenced on the 3d day of December, 1946, and concluded on the 4th day of December, 1946, and oral argument was set for January 10, 1947, at the conclusion of which the court announced its decision from the bench and held the Tug Cornell No. 20 and The Cornell Steamboat Company, as claimant thereof, solely responsible, exonerated the deck scow Frank Cooney, and dismissed the libel as to it and all other claimants.

Thereupon, the Advocate for Cornell called attention to the case of United States, Appellees, v. Carroll Towing Co. Inc., and Pennsylvania Railroad Company, Appellees, Grace Line, Inc., Appellant, 2 Cir., 159 F.2d 169 in which, he said, the Appellate Court had held the Tug and the Harbor Masters jointly liable, but a copy of the opinion was not yet available. This court thereupon agreed to hold in abeyance the making of Findings of Fact and Conclusions of Law until the opinion of the Appellate Court could be secured and studied, and has since done so and now feels that this formal opinion should be written.

On August 22, 1944 a libel was filed in this court by Erie Railroad Company, as owner of the covered barge No. 289, and as bailee of two certain shipments of merchandise laden thereon, and as owner of the causes of action for loss of and damage to said shipments of merchandise, and on behalf of the Master of the covered barge against The Tug Cornell No. 20, her engines, etc., and the deck scow Frank Cooney, her tackle, etc.

On August 24, 1944 the New York Trap Rock Corp., as owner and Christie Scow Corporation as bareboat charterer of the scow Frank Cooney, filed a petition in this court for exoneration from or limitation of liability and a monition was thereupon issued.

On Sept. 29, 1944, trustees in reorganization of Central Railroad of New Jersey as owners of the Barge C. R. R. No. 342 filed a claim for damage thereto in the amount of $750.00.

On Oct. 3, 1944, New York Dock Company, owners of Pier 17 on the Brooklyn shore of the East River, filed a claim for damage to said pier in the amount of $60.00.

On Oct. 3, 1944, Erie Railroad Company, as owner of covered barge No. 289 and as bailee of shipments of merchandise therein contained, filed a claim in the amount of $11,500.

On Oct. 11, 1944, the trustees of Central Railroad of New Jersey, as owner of the barge C. R. R. No. 342, filed an answer to the petition of the New York Trap Rock Corporation, et al, in the limitation of liability proceeding.

On Nov. 15, 1944, The Cornell Steamboat Company, as claimant of the Tug Cornell No. 20, filed a petition to implead: (1) the Jarka Corporation; (2) the Erie Lighter No. 258; (3) the New York Trap Rock Company as owner of the scow Frank Cooney; (4) the Christie Scow Corporation as charterer of the scow Frank Cooney, and (5) the Pennsylvania Railroad Company as sub-charterer of the scow Frank Cooney, and on the same day said Cornell Steamboat Company filed interrogatories addressed to the above.

On Nov. 15, 1944, the Cornell Steamboat Co., as claimant of the Tug Cornell No. 20, also filed an answer to the libel of the Erie Railroad Company.

On Nov. 18, 1944, a citation issued under Admiralty Rule 56.

On Jan. 19, 1945, the Jarka Corporation filed an answer to the petition of the Cornell Steamboat Company and answer to the interrogatories propounded to it.

On Feb. 28, 1945, the Cornell Steamboat Company as owner of the Tug Cornell No. 20, filed an answer to the petition of New York Trap Rock Co., et al, to limit liability, and also filed a claim for damages to the Tug Cornell No. 20 in the amount of $2,000.

The two causes came on to be heard on Dec. 3, 1946, and by stipulation of the proctors for the respective parties, it was agreed that they should be heard together.

The New York Dock Company owns a large segment of the Brooklyn Waterfront commencing with Pier No. 4 on the East River, Brooklyn shore, just south of the old Brooklyn Bridge, and extending in a southwesterly direction to Pier No. 47 at Van Brunt Street (excluding Pier No. 44).

On Feb. 25, 1944, six barges were moored, abreast of one another, at the outer end of Pier No. 10 (Brooklyn). Nearest the pier was Erie No. 221; next, Lehigh Valley No. 53; next, Erie No. 289; next, Erie No. 295, and next, two additional barges not identified by number but one was undoubtedly a C. R. R. of N. J. boat, since that Company filed a claim in the limitation proceeding for barge No. 342.

Pier No. 17 (Brooklyn) is 648 feet long and 115 feet wide, covered with a shed from the inshore end to within 6 feet of the outshore end, which open space is called an "apron" and extending the width of the pier except for an allowance of about 3 feet on the outer sides along the respective edges of which is a string piece equipped with iron cleats having arms or "horns" about 10 inches above the stem, which is bolted to the string piece at specific intervals.

Pier No. 17 was leased to and operated by the Isthmian Steamship Company for the reception, loading and stowage of cargo into ocean going merchant vessels. Jarka Corporation were employed by Isthmian as stevedores in connection therewith.

On Feb. 21, 1944, the Steamship Mokihanna was berthed, bow in, upon the upper or north side of said pier, at the inshore side of the slip receiving cargo from the lighters, barges or other craft brought alongside the pier or vessel. One of such was the scow Frank Cooney which was brought to the portside of said steamer. In the course of discharging her cargo, consisting among other things, of steel billets, one or more of such billets were dropped into the hold of the scow piercing her bottom and causing the scow to capsize. It was towed to a position astern of the S. S. Mokihanna, and about 10 or 15 feet inshore from the river end of the pier. The evidence indicates and it is conceded, that she had raked or cutaway ends, thus extending the submerged deck on the scow about 10 additional feet in the direction of the end of the pier, but not visibly so. There is a conflict in the evidence as to the manner in which the Cooney was moored. It is not disputed that a ¾ inch cable was used; Waugh, a watchman employed by Isthmian testified there were two such cables, one extending from the cleat on the string piece about 25 or 30 feet inshore from the river end of the pier to and through the hole in the bottom of the scow and attached to the keel beam (inside of the scow) and thence went down to the deck and came up outside and around the hull and thence back to the cleat. Waugh, however, had nothing to do with the tying up of the scow and described what he remembered of what he observed. Dries, Waugh's superior, in charge of all watchmen of Isthmian, testified there was a cable to a post at the river end of the pier and a cable to the aforesaid cleat, and both ran out of the hole in the bottom of the Cooney, but he did not know how or to what they were made fast on the inside of the scow. Both of these witnesses saw the Cooney on the mornings of the 24th and 25th of February at high tide and she appeared to be safely moored at that time. McCabe, an Harbor Master, testified he was on the tug which put the Cooney in her final position for mooring

and that two cables were used. The first was put into the hole in the bottom and tied to a cross rib and then fastened to the cleat; another cable was also put through the hole in the bottom and tied to the cross rib and then fastened to the forward ballard (post at the end of pier). Ford, employed by Isthmian as Superintendent of the pier, testified that the moving and mooring of the Cooney was "my dock boss's job, between the dock boss and the harbormaster."

"Q. When you say your harbormaster, are you speaking of the Jarka employees? A. Well, it is a contract we have, that we give Jarka the orders for to bring in so many harbormasters each day. We pay the bill and Jarka hires the men.

"By the Court: Well, who gives them their orders? * * * A. I gave the orders—I give Jarka the orders on the men, and from then on the dock boss gives all the orders to the harbormasters of what boats he wants placed and where he wants them placed. .

"Q. Who was the dock boss on pier 17 at that time? A. At that time it was Gus Fink."

At the time of this trial Fink was no longer working for Isthmian.

"By the Court: Do you know where he works now, or where he is? A. I am not sure whether he is on the 31st or 33rd Street pier in Brooklyn. He works for the Universal Stevedoring Company.

Fink was not called as a witness.

On the afternoon or evening of Feb. 24, 1944, a New York Central barge was moored at the outer end of pier No. 17. Erie No. 258 had discharged cargo on the south side of pier No. 17 and had been brought abreast of the New York Central barge. When Derienzo, the bargee of No. 258 was about to leave at 5 p. m. to go home he was informed that No. 258 would be towed during the night and that he should go to pier No. 30 (Brooklyn) to "pick up westbound freight." He reported accordingly at 10 minutes before 8 A. M., which was his scheduled time to go on duty, but the boat was not there; he telephoned his office and then went to Pier No. 17 and found his barge had replaced the New York Central barge and was moored, bow downstream, with a 5 inch line fore and aft to the dock, and abreast of his barge was the D. L. & W. No. 576, also bow downstream. This barge had been at Pier No. 4 Hoboken on the 24th and had been towed to Pier No. 17 during the night; when Captain Jonsson came aboard the No. 576 at 7:45 on the morning of the 25th, he found that his barge was made fast to the Erie with 5 inch lines, three parts, fore and aft; he then went on the dock and looked at the lines of the Erie No. 258 and found the lines o. k. He also saw the sunken scow on the north side of the pier and just inside of the riverhead of the pier, but paid no more attention to it.

The Lehigh Valley barge No. 77 was berthed on the south side of Pier No. 17, where it had discharged cargo, and Cornell Tug No. 20 had been engaged by Moran Towing Company for Isthmian, to shift that barge to a position at the outer end of Pier No. 17 abreast of the No. 576, also bow down river. To perform this operation the Captain of the Tug No. 20 testified he took the No. 77 in tow on a hawser 10 to 20 feet long and proceeded out into the East River, on a diagonal, passing the Erie and D. W. L. barges, moored at the end of the pier, a distance of 200 or 300 feet, but swung downstream, that is, against the tide, so that the No. 77 may have been only a distance of about 10 or 15 feet from the Erie and D. W. & L. barges, but his purpose was, at the appropriate time, to float the No. 77 back on the flood tide to a position abreast of the No. 576, and as the court understood it, the contention of the Cornell is that the bow line of the Erie gave way, causing the two barges to swing out from the pier by the force of the tide and the No. 77 collided with the No. 576.

The greater weight of the evidence is, and the court believes, that the Cornell came out of the slip between piers No. 17 and No. 18 with the No. 77 hooked up on the starboard side of the tug with the bow and backer lines running from the middle of the tug, fore and aft to the No. 77, and a stern line from the tug to the barge. McCabe and Elorriago, Harbor Masters,

were respectively fore and aft on the top of the deck house of No. 77, which was between 112 and 115 feet long; the strength of the tide forced the two against the No. 576 so that the No. 77 came into contact amidship with the starboard forward corner of the No. 576. Elorriago shouted that he had a line out, which caught a cleat on the No. 576 and at about that moment the bow line from the Erie No. 258 to the pier snapped or gave way, and the three barges swung into the stream, so that the north end of the Erie was forced within the slack of her remaining line, against the scow Cooney, and the pressure was sufficient to cast off her first cable mooring to the ballard post and then her cable mooring to the cleat, and she drifted on the tide across, and out of the slip and went on a rampage up the river, finally colliding with Erie No. 289, the third barge from the end of Pier No. 10, cutting her, as well as others, loose. The bargee of No. 289 had reported for duty at 8 A. M. but went ashore about nine o'clock to get a pail of water and when he returned to the dock his barge had broken adrift and he ultimately found it at Pier No. 2; she was not down on the bottom, but resting on a ledge; however, the water was up around her windlass. She had aboard a cargo consisting of 3 carloads of soap powder and one carload of wood pulp. Stevedores began salvage work at 1 p. m. and recovered about 900 boxes of soap powder.

On March 1st the No. 289 was towed to the mouth of Newtown Creek, Long Island City, and was ultimately put into dry dock and repaired.

Some other features of this case must be noticed.

When Dries and Waugh visited Pier No. 17 on Feb. 25th, they came out on the apron through a door in the center of the outer end of the pier shed, and the first thing that Dries noticed was a strain on the down river line from the Erie barge to the dock and he observed that this line had a broken strand and he considered it in danger of parting. They then walked over to the north end of the apron to look at the Cooney and found her mooring was as it had been the day before. The next

thing that attracted his attention was the abnormal exhaust of the engine of the steam tug, and his testimony confirms others, which establishes to the satisfaction of the court, that the barge No. 77 was abreast of the tug No. 20. Dries was also very certain that the north end of the No. 258 swung into the slip on the north side of the Pier No. 17 sufficiently to disturb the mooring of the Cooney and set her adrift.

The court disregards the contention that the absence of the Captain of the No. 258 at the time of the collision and immediately before that, was a contributing cause to the setting adrift of the Cooney. The No. 258 was tied up during the night, and Captain Jonsson did perhaps as much as the Captain of the No. 258 would have done when he reported for duty, namely— examined the moorings, which Jonsson found to be o. k. at that time. The condition found by Dries, was created after the No. 576 had tied up and put an additional strain, together with the fast running tied, on the No. 258. See Osterhoudt v. Federal Sugar Refining Co., 2 Cir., 22 F.2d 475.

The court also disregards the similar contention regarding the bargee of No. 289. He gave an excuse for being ashore; had he been aboard it is entirely problematical what he could have done, if anything, to have avoided the collision with the Cooney, and on the question of the operation of the pumps, that would only be in mitigation of damages, which is not before the court now.

If, as Cornell claims (the No. 20 and the No. 77 went out of the slip in tandem formation on a diagonal downstream with the avowed purpose of putting the barge alongside of the No. 576 bow downstream, it is inconceivable to me how the No. 77 wound up alongside the No. 576 bow upstream. The Captain of the No. 20 testified that from his position in the wheel-house, he could not see over the top of the deck house of the No. 77. It is likewise inconceivable to me, if he had the No. 77 strapped on the starboard side of the Tug No. 20, how he could possibly have

seen the No. 258 and No. 576 as they were moored.

After the collision between the No. 77 and the No. 576, Elorriago, the Harbor Master on the after deck of the No. 77, threw out the line, and when the line caught on the cleat or bit, he "snubbed" it; that of course was for the purpose of easing any further shock.

It is the contention of Cornell that the snubbing of the line caused the breaking of the mooring, but it appears to this court that the contact between the No. 77 and the No. 576 broke the mooring, which occurred before the line was snubbed.

Lastly, relying upon the most recent determination of the Circuit Court of Appeals (Second Circuit) above mentioned, which differs very substantially on the facts, Cornell contends that since the Captain of the No. 20 received his instructions in regard to the berthing of the No. 77 from the Harbor Masters, that the employer of the Harbor Masters should be held jointly responsible. The Cornell was engaged by Moran, acting as agent for Isthmian.

Incidentally, neither the Captain directed the Harbor Masters, nor did the Harbor Masters go aboard the No. 576 and the No. 258 before undertaking to berth the No. 77 alongside, for the purpose of ascertaining, in the face of the strong running tide, whether the existing mooring lines could take any further strain. But it appears that such directions as were given for the purpose of moving and berthing these vessels without power by tugs, were given by the dock boss of the Isthmian, and under those circumstances this court does not feel that it was in error in declining to hold there was a dual liability on the part of Jarka Corporation, and there must be a decree in this case in favor of the libelant against the Cornell Tug No. 20 and the Cornell Steamboat Company as owner, exonerating the scow Frank Cooney, and dismissing the libel as against all other claimants.

## On Rehearing.

Respondent Tug Cornell No. 20 seeks a reargument and reconsideration of this suit in Admiralty predicated upon that portion of the opinion which reads, as follows: "It is the contention of Cornell that the snubbing of the line caused the breaking of the mooring, but it appears to this court that the contact between the No. 77 and the No. 576 broke the mooring, which occurred before the line was snubbed."

The motion for reargument is granted.

█ Proctors for the claimant of the Tug Cornell No. 20 contend that such statement is contrary to the weight of evidence, and in support thereof points out and emphasizes certain portions of the testimony of Jarka's Harbor Master, McCabe, in his written report (Cornell Ex. E), the testimony of the second Harbor Master, Pete Elorriago, and the witness Dries, whom Cornell's advocate claims testified: "That the mooring line of the inside Erie boat did not part until after the Harbor Master had snubbed the No. 77 x x x".

And at the close of his cross examination again stated that the inner mooring parted "after the line was made fast to the second barge."

Claimant's advocate points out that: "Inasmuch as the Court has given the greater weight to the testimony of the foregoing witnesses in determining the disputed issue as to the manner in which the Cornell No. 20 towed the Lehigh Valley No. 77, it would seem that their testimony should be of equal weight on the fact that the mooring of the inside Erie boat did not part at the time of the bump or contact between the No. 77 and the outside D. L. & W. boat, and not until the harbor master Pete snubbed the No. 77 to the D. L. & W. boat, after the bump or contact occurred."

In consequence, I have again carefully reviewed the evidence pertaining to this issue. In the first place every witness who testified as to the manner in which the Lehigh Valley barge was towed out of the slip aligned himself against the claimant's version. The court could have, therefore, disbelieved any of the witnesses above mentioned on any other point but hardly in the instance referred to.

The report made by McCabe relates that the second Harbor Master, referred to as

Pete, who was on the deck of the Lehigh Valley No. 77, threw a line on the No. 576 and that the No. 77 then swung in against the two barges tied to the outer end of the pier. But that statement does not indicate that the line was "snubbed" or made fast at that moment. The report further states that after the No. 77 swung against the two barges the upriver end of the No. 77 was made fast by McCabe; that the tide was strong, and that when the Tug let go, the strain on all three barges caused the south line of the Erie barge to part. Moreover, this report lacks much of the detail which was supplied by oral testimony at the trial.

McCabe admits that the No. 77 struck the No. 576 before the line was thrown and snubbed, although he did not see the contact as he was on the bow end of the No. 77; McCabe was not in a position to see the bow line from the Erie No. 258 to the dock, so that his testimony as to when the barges swung out into the river does not make it clear when that line to the dock parted. The Tug Cornell No. 20 was, at least for a short time, in a position parallel, and close to the three barges at the pier end, after the No. 77 had swung into place, and it seemed to the court a reasonable conclusion that with the Tug in such a position the swinging out of the barges may have been delayed or impeded, even though the line from the Erie No. 258 to the dock had already parted.

With relation to the portions of the testimony of the Witness Pete. A review of his testimony discloses that the contact of the No. 77 and the No. 576 came before the line was thrown and snubbed. His testimony fails to disclose that it was not the contact of the two barges which caused the line to part, but he did state that after the No. 77 had swung into position he noticed the other two barges swing out.

This is certainly no proof that the line had not parted when the contact of the No. 77 with the No. 576 was made, because the Tug Cornell No. 20 had been at that time in a position to hold the barges from moving out any great distance and it was not until she freed herself that both McCabe and Pete became aware that the barges were no longer secured to the south end of the pier.

The witness Dries stated that the barges began to swing out from the pier after he saw a line thrown from the No. 77 to the No. 576 and that the line to the dock parted after the line from the No. 77 to the No. 576 was made fast. When Dries was on the apron at the end of pier No. 17 as he testified, the witness Waugh was also on the apron at the same time. He could not see the crash but heard it. However, Waugh testified:

"Q. Then after you heard the crash did something else happen that you saw? A. Yes. The lines on the south side of the pier gave way and these two lighters that were already tied up there started to swing around north."

On cross examination this witness did not further clarify the situation.

On the other hand, the witness Jonsson, the Captain aboard the No. 576 at the time of the occurrence stated that there was no line from the No. 77 to the No. 576 at the time the bow line to the dock parted, although he admits that he could not then see the line from the No. 258 to the dock; but he did testify that as soon as the contact occurred, the line to the dock parted.

Finally, if the snubbing of the line by Pete did cause the parting of the bow line from the No. 258 to the dock, it is not apparent to the court that it would relieve the claimant from liability.

■ The Harbor Masters were men of experience and if Pete acted without specific orders from the Captain of the Tug Cornell No. 20 in throwing out and snubbing the line, as the claimant contends, it was due to two things: (a) because the Tug was on the portside of the barge and its house obscured the view of the Captain and (b) Pete acted in accordance with his best judgment in an emergency. Moreover, in undertaking to place the No. 77 alongside the No. 576, especially with such a strong tide running against it, the Captain of the Tug Cornell No. 20 erred in not sending some member of his crew, or a Harbor Master if subject to his orders, to investigate the security of the mooring of the other two barges, and, if that had been

**134**

done, it would have disclosed the condition of the mooring line described by Dries. United States v. Carroll Towing Co. Inc., and Pennsylvania Railroad, and Grace Line, Inc., 2 Cir., 159 F.2d 169.

The court realized the rapidity with which the events occurred within a very short period of time, and based its decision on the evidence and the reasonable inferences to be drawn therefrom.

Upon reconsideration of the points raised by this motion, the court adheres to its previous decision. Settle order on notice.