Velis, PeterA., J.
The plaintiff, Anthony Spagnulo (“Spagnulo”), brought this action for injuries he suffered when he fell off a set of bleachers located at a hockey rink, Ray Smead Memorial Skating Rink (“Smead Arena”), which is owned by the defendant, Commonwealth of Massachusetts Department of Environmental Management (“the Commonwealth”), and operated and controlled by Pioneer Valley Arena (“Pioneer”), a property management company. Spagnulo alleges negligence against both defendants (Counts I & II) and/or recklessness against both defendants (Count III), for the defendants’ failure to install safely railings on the bleachers. Plaintiff, Judith Spagnulo, also brought a claim against both defendants for loss of consortium (Count IV). Both defendants now move for summary judgment, claiming that their conduct, as a matter of law, does not rise to the level of recklessness, which is required for liability to attach under the Massachusetts “recreational use statute.” *729 For the following reasons, the defendants’ motions are ALLOWED.
BACKGROUND
On or about February 19, 2000, Spagnulo was lawfully on the premises of Smead Arena watching his son’s youth hockey game. He was not charged a fee for his admission to the arena. At the time, the Commonwealth of Massachusetts Executive Office of Environmental Affairs owned Smead Arena, and Pioneer managed and operated it. Spagnulo was standing on bleachers inside the arena, watching the hockey game that was taking place.
The bleachers are of the familiar type found in small gymnasium and arenas that can be collapsed against the wall to save space. They are made of wood, having about six levels of seats. By all reports, they were in good repair, and Pioneer regularly inspected and maintained them. The top bench was approximately six feet above the floor, and the top floor board, which Mr. Spagnulo was standing on, was between five and six feet off the ground. There are no railings along the side of the bleachers. The accident is described by Spagnulo as a “fluke.” He was simply watching his son skate from left to right when all of a sudden Spaginulo realized he was falling to his right. He fell off the bleachers, dropped five or six feet, landed on his face, and suffered injuries, including broken teeth and injuries to his shoulder and neck.
All of the Commonwealth’s eighteen rinks are run by various corporations which contract with the Commonwealth to maintain and operate the rinks. Pioneer contracted with the state to run Smead Arena from 1996 to 2001. There is no question that Pioneer, being the party solely responsible for the day-to-day operation of the rink, was in control of Smead Arena for the purposes of this action. In its bid to operate Smead Arena, Pioneer included a proposal to install railings on the sides of the bleachers. Pioneer apparently had a great deal of independence in running and operating the rink, and it appears that this proposal to install railings was no more than a proposal and not a firm contractual obligation to actually install them. According to Pioneer’s owner and manager, his proposal was essentially a “wish list” of all improvements he might make to the arena, and “in a perfect world” the railings would have been added to the bleachers, but other projects took precedence and he never installed them. Pioneer’s list of proposed repairs and improvements were subdivided according to priority; installing railings on the bleachers at Smead Arena was listed as “Priority 1.” A “program manager” from the Commonwealth (“Todd Lafleur”), testifying without knowing the specifics of Pioneer’s bid and contract with the Commonwealth. He stated that as he is responsible for “permit and bid compliance,” if Pioneer proposed installing railings, he probably should have provided oversight on behalf of the Commonwealth to ensure that Pioneer completed proposed repairs and improvements, such as installing railings on the bleachers. There is no evidence or indication of other reported falls of this kind at Smead Arena or at any other of the rinks owned by the Commonwealth prior to the time this accident occurred.
The plaintiffs argue that Pioneer did not install the railings simply to improve its bottom line. Pioneer’s president, Jerome Costello, admitted that the fewer repairs and improvements he made, the more profit he stood to make on his operations contract. The defendants counter that there had been no history of bleacher falls at any of the Commonwealth’s rinks that would indicate a need for bleacher railings, that the bleachers at Smead Areana were really were not that high, and that they presented, at most, a modest danger.
DISCUSSION
This Court grants summary judgment when there are no genuine issues of material fact and when the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Comm’r of Corr., 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing parties’ case, or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. Gen. Motors Corp., 410 Mass. 706, 716 (1991). The non-moving party must oppose the motion with admissible evidence on the issue in order to defeat the summary judgment motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Summary judgment should be granted cautiously in cases where recklessness and/or negligence is an issue; most often those issues are best decided by a jury. See Irferrera v. Sudbury, 31 Mass.App.Ct. 96, 102 (1991).
The parties do not dispute that Smead Arena was owned by the Commonwealth and operated by Pioneer for recreational purposes and that Spagnulo did not pay a fee for his admission to watch his son’s hockey game. Therefore, the “recreational use statute” or General Laws c. 21 §17C, is applicable here with regard to both defendants.[3] As such, the defendants can be held liable only for conduct that is “willful, wanton or reckless.” See G.L.c. 21, §17C; Ali v. City of Boston, 441 Mass. 233, 238 (2004) (applying the recreational use statute). Therefore, the negligence counts (I & II), are thereby disposed of. In the context of the recreational use statute, the words “willful, wanton or reckless” have been interpreted collectively as meaning “reckless” conduct. Sandler v. Commonwealth, 419 Mass. 334, 335 (1995).
*730 The longstanding custom in the Commonwealth “has been to measure reckless conduct by the same test whether reckless conduct is alleged as the basis for liability in tort, or as the basis for guilt of involuntary manslaughter.” Id. at 336 (internal citations omitted). In other words, one way to test if the plaintiff has met his burden of proof as to recklessness in tort is to decide whether, if the plaintiff had died, would the circumstances warrant a conviction of involuntary manslaughter. Id.
The Commonwealth’s standard for recklessness also closely follows that found in Restatement (Second) of Torts §500 (1965), as including either an objective or a subjective element of knowledge of the risk:
[T]he actor’s conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.
Id. (emphasis added). Recklessness is a substantially higher standard than negligence; therefore it is incumbent upon Spagnulo to show something that truly distinguishes his claim from a simple negligence claim.
The Court has carefully read the briefs and accompanying evidence submitted by both parties, mindful of the fact that the Court should allow a recklessness claim to go before a jury if a genuine issue of material fact can be shown. Even so, it is clear to the Court that the facts of this case, as a matter of law, cannot amount to what the Supreme Judicial Court (“SJC”) has defined as recklessness. See Sandler v. Commonwealth, 419 Mass. 334 (1995); Manning v. Nobile, 411 Mass. 382, 386 (1991) (affirming trial court’s granting of summary judgment because plaintiff could not meet burden of proof for recklessness).
The facts in Sandler are very similar to the facts in this case. In Sandler, the dangerous condition was a twelve-inch by eight-inch hole in the pavement located in the middle of an unlit bicycle tunnel. A bicyclist was injured when his bicycle wheel was caught in the hole, and he was thrown off his bicycle. Id. at 335. The SJC was unwilling to accept that the risk presented by the hole and the broken lighting presented “a high degree of risk that death or serious bodily injury will result from a defendant’s action or inaction when under a duty to act.” Id. at 337. The SJC held that the simple tripping hazard presented in Sandler was not enough for a defendant’s actions to be found reckless. Id.
Certainly, the hazard presented in Sandler could have caused death or catastrophic injury. However, objectively speaking, such a mortal injury cannot been seen as likely. More aptly, the danger in Sandler could be seen as posing a clear possibility of causing a non-fatal injury. Here, we have some bleachers that were obviously six feet high, and also obviously had an edge (in Sandler the danger was obscured by a lack of lighting). A fall from a set of bleachers presents a risk of injury, but, given the obviousness of this danger, the Court cannot say that the risk was high. Furthermore, a fall from a height of six feet presents a risk of injury, but the Court cannot see how a jury could reasonably conclude that this fall would result in an injury that one could not, to use the vernacular, “walk away from.”
In terms of notice of the danger, in Sandler, the SJC found that the state agency responsible for the maintenance of this tunnel was fully aware of the defects in question for some period of time[4] prior to the plaintiffs injury. The agency knew the drain covers were not fastened in place and were frequently removed by vandals. Furthermore, the SJC found that economically feasible vandal-proof lighting and drain covers could have been easily installed, but never were. Id. at 337. Similarly here, the defendant Pioneer was aware that the lack of railings on the bleachers presented a risk of injury. It had installation of railings on its “to-do list,” and even listed that project as a high priority. The Court notes, without deciding, that in both the instant case, and in Sandler, these facts would have been significant if the plaintiffs were only trying to prove negligence. However, when a plaintiff has to prove recklessness, his awareness of a danger, the existence of feasible precautions, and failure to mitigate the danger, do not carry the day.
The SJC has “defined ‘wilful, wanton, or reckless’ conduct as: intentional conduct, [involving] ahigh degree of likelihood that substantial harm will result to another.” Manning, 411 Mass. at 387. The plaintiffs make much of the fact that there is strong evidence that Pioneer did not install railings as a cost savings measure. However, this statement is really no more than a truism; every premises contains some potential dangers, and precautions always cost money. The manager of a premises must balance the potential harm and the likelihood of that harm occurring versus the cost and feasibiliiy of repairs and precautions to prevent that harm. See United States v. Carroll Towing, 159 F.2d 169, 173 (1947, Learned Hand, J.). Just because a properfy manager decides that a precaution is not worth the money, even if that decision is later proved erroneous, it does not make his decision reckless.
The following passage from the Restatement is particularly instructive in distinguishing negligence from recklessness, which is essentially the Court’s task here.
g. Negligence and recklessness contrasted. Reckless misconduct differs from negligence in several important particulars. It differs from that form of negligence which consists in mere inadvertence, incompetence, unskilfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that reckless misconduct requires a conscious choice of a course of action, either with knowledge *731 of the serious danger to others involved in it or with knowledge of facts that would disclose this danger to any reasonable man . . . The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind.
Restatement (Second) of Torts §500 p. 3 (1965). An analysis of the cases in the Commonwealth which have drawn the boundaries of recklessness reveal a clear pattern: Failure to take precautions is almost never considered reckless conduct. This is consistent with the general view that “the risk of death or grave bodily injury must be known or reasonably apparent, and the harm must be a probable consequence of the defendant’s election to run that risk or of this failure reasonably to recognize it.” Sandler, 419 Mass. at 337; see e.g., Ali v. City of Boston, 441 Mass. at 239 (erecting a gate across a bicycle path, which the plaintiff crashed into, without warning signs or lights, not reckless conduct for purposes of recreational use statute); Smith v. Town of Plymouth, 61 Mass.App.Ct. 1107 (2004) (town’s failure to remedy seat of swing-set which showed cracking and signs of wear not reckless); Manning, 411 Mass. at 388 (claim of recklessness based on hotel’s failure to provide bartender for private party rejected); Howco v. Mass. Bay Transp. Auth., 398 Mass. 1006, 1007 (1986) (defendant not reckless in leaving bus passenger at station where it appeared to bus driver that burglary was in progress); Mounsey v. Ellard, 363 Mass. 693, 694 (1973) (failure to repair drain resulting in accumulation of ice on defendant’s premises not wilful, wanton, or reckless conduct); Sawler v. Boston & Albany R.R., 339 Mass. 34, 36 (1959) (longstanding failure to fulfill statutory duty to maintain fence along right of way, thus permitting child to cross railroad tracks not wilful, wanton, or reckless misconduct); Slyer v. Atlantic Union College, 338 Mass. 212, 216 (1958) (where young child fell into pit and died because some third party removed pit’s cover, landowner not liable for wilful, wanton, or reckless misconduct); Carroll v. Hemenway, 315 Mass. 45, 46 (1943) (where police officer investigating building fell into unguarded and unlit elevator well, lack of repair not wilful, wanton, or reckless conduct).
Examination of preceding cases heretofor, setting forth various views of recklessness, cause the Court to conclude that many variables exist in the nexus between failure to take precautions and the plaintiffs injury. Passage of time, obviousness of the danger, the chances of this type of specific types of injury occurring, and intervening/supervening causes between the actor’s conduct and the injury, deem it a rare case where failure to take precautions results in a recklessness finding. One such rare case is Romana v. Boston Elevated Ry., where the defendant was found reckless in failing to keep visitors from being harmed, but the harm was posed by a well-known, artificial, and potentially lethal condition. 218 Mass. 76, 78 (1914) (girl shocked and burned when she tripped onto electrically charged pole on path commonly used by children with defendant’s permission, where defendant had been warned of condition of pole, and had done nothing).
On the other hand, many of the cases involving reckless conduct involve motor vehicles with conduct that amounts to a near-intentional disregard of a substantially grave danger. The nexus between the actor’s conduct and the injury in the following cases is much less remote than in failure to take precautions cases. See e.g., Sheehan v. Goriansky, 317 Mass. 10, 15 (1944) (finding warranted that driver’s conduct was reckless where driver knew that trespasser was on running board, increased speed, and ran into pole, killing him); Baines v. Collins, 310 Mass. 523, 526 (1942) (question for jury whether truck driver was reckless where he knew boy on bicycle was holding onto heavy truck, continued to drive thirty-five miles an hour on asphalt highway, and suddenly and unnecessarily veered onto shoulder of road, throwing boy from bicycle and injuring him); Isaacson v. Boston, Worcester & N.Y. St Ry., 278 Mass. 378, 390 (1932) (finding that bus driver was reckless warranted where brakes were not functioning and driver was speeding in a forbidden lane, in violation of three separate laws); Yancey v. Boston Elevated Ry., 205 Mass. 162, 171 (1910) (jury could have concluded that conductor acted recklessly when he deliberately and without warning started streetcar despite knowledge that disabled person stood on step and held onto car, so that plaintiff was dragged and fell onto street); Aiken v. Holyoke Rt. Ry., 184 Mass. 269, 270 (1903) (proper question for jury whether motorman was reckless in quickly starting streetcar when he knew young boy, clinging to step of car and yelling for help, was in great peril, thereby throwing him under wheels of car).
On the other hand wherein motor vehicles are not the issue, certain findings of recklessness are warranted. See Freeman v. United Fruit Co., 223 Mass. 300, 302 (1916) (deliberately throwing a large heavy roll of canvas stiffened with ice off ship’s deck from great height, thereby breaking plaintiffs leg); Zink v. Foss, 221 Mass. 73 (1915) (setting dog on boy who had fallen into defendant’s yard).
In sum, and as the SJC held in Sandler, “the level of fault in this case, measured by the degree of risk of serious injury is more consistent with cases in which [the SJC] has held that the evidence did not warrant a finding or wanton or reckless conduct.” Sandler, 419 Mass. at 340. Though the Court is supposed to let questions of recklessness go before a jury if at all possible, it also cannot allow a claim that cannot meet the legal standard of recklessness survive summary judgment. The defendants here, by their acts or omissions, did not do anything that was near certain to result in severe bodily harm or death. The danger posed by a fall from a six-foot high bleacher without a railing is not severe enough. The likelihood that a *732 severe injury would occur on these bleachers, with a clearly defined edge and clearly absent guardrails, was not high enough. Here, the Court is convinced that the most a rational jury could find is thát the defendants failed to take precautions to prevent a possible future accident which was not likely to be fatal. In light of the well-established standard of recklessness in tort law, the plaintiffs have not met their burden of proof.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendants’ Motion For Summary Judgment is ALLOWED.

 “(a) any person having an interest in land including the structures, buildings, and equipment attached to the land, including without limitation, wetlands, rivers, streams, ponds, lakes, and other bodies of water, who lawfully permits the public to use such land for recreational, conservation, scientific, educational, environmental, ecological, research, religion, or charitable purposes without imposing a charge or fee therefor, or who leases such land for said purposes to the commonwealth or any political subdivision thereof or to any nonprofit corporation, tmst or association, shall not be liable for personal injuries or property damage sustained by such members of the public, including without limitation a minor, while on said land in the absence of wilful, wanton or reckless conduct by such person ...”

 In fact testimony indicated that the lights in the tunnel may have been broken for at least thirteen years prior.