**CLEARY BROS., Inc. v. MORAN TOWING CORPORATION.**

**THE CLEARY NO. 54.**

**A. 17004.**

United States District Court
E. D. New York.

**Aug. 15, 1947.**

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for libelant.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for respondent.

KENNEDY, District Judge.

Libelant is the owner of Cleary No. 54.[1] Sometime prior to October 1, 1943, libelant had delivered Cleary No. 54 to Christie Scow Corporation under an arrangement which is nowhere in the record clearly disclosed. Apparently, the libel was framed on the theory that Christie Scow Corporation (called Christie hereafter) was a mere broker. On the other hand, it is abundantly clear that respondent Moran Towing Corporation (called Moran hereafter) treated Christie as the chartered owner of the scow, and paid the scow hire direct to Christie. At the time of the demise (under the terms usual in New York harbor) to Moran, there was on board the scow a bargee, the employee of Cleary. Prior to October 25, 1943, Cleary No. 54 safely carried three cargoes.[2]

On October 23, 1943, the bargee of Cleary No. 54 was informed that his scow had sprung a rather bad leak at her starboard stern corner. Some mention should be made of how this occurred. Cleary No. 54 had, prior to the odyssey out of which the present litigation arose, been involved in a collision in the Hudson River (March 3, 1942). Her owners brought suit. There was a decree in their favor. But after the amount of damages had been ascertained, a dispute arose over the propriety of the award, the respondents claiming that it could not properly be paid because it was based in large measure on a repair program which contemplated the edgebolting of the strakes on the starboard side in the area of damage, a program that was never carried out. After the collision, Cleary had sent the scow to certain shipyards, and, instead of edgebolting the new strakes, the yards, at the request of Cleary, had screw-bolted them, and shored them up with king posts in the area of damage. By this means, Cleary repaired the scow and put her back in service at a cost of $1,000., as compared with an award, made by the Court on the basis of a commissioner's report, which was in the amount of $2,700.

The respondents in the prior litigation challenged this procedure. Cleary, however, successfully contended that no matter what it actually spent for repairs, it was, nevertheless, entitled to an award which would follow strictly the principle of restitutio in integrum. The commissioner who dealt with the matter reported that, even though the scow had not been restored to the condition in which it was prior to the collision, nevertheless, Cleary was entitled to the full amount of the award.

[1] Cleary No. 54 is a wooden deckscow 115 feet long and 36 feet wide.

[2] On September 30, 1943, the scow was taken to Pier 9, New York Dock Company. There she was laden with ballast. This cargo was discharged at Astoria on October 5th. The scow was then taken to Pier 22, East River, and on October 9th was again towed to Green Street, Greenpoint. At the latter place she was laden with 700 tons of sand and gravel, and was towed to Astoria. This cargo was discharged on October 12th. The scow was then taken to Pier 36, North River. On October 13th she was laden with 700 tons of sand and gravel, and on October 21st she was towed to Pier 39, North River, to 24th Avenue, Brooklyn.

This report was confirmed by Judge Inch. The Cleary No. 54 (The Rose Reichert et al.), D.C.E.D.N.Y., 75 F.Supp. 217.

I now turn back to the discovery of the leak in the starboard stern corner of Cleary No. 54 on October 23, 1943, while she was moored at a dock in Bath Beach, laden with cargo. Respondents, or one of them, in the Reichert litigation had engaged surveyors to examine .Cleary No. 54 in order to prepare for the hearing before the commissioner. These surveyors went on board Cleary No. 54 on October 23, 1943. It was then that one of them discovered the leak in the starboard stern corner, which had nothing whatever to do with the damage caused in the March 3, 1942 collision, the immediate concern of the surveyor's inspection. It should be made clear at this point that beyond dispute the leak which I have mentioned was not caused by a violent contact, and no one even claims that it developed while the scow was in the service of Moran. The only possible finding on the point is that the leak was produced by ordinary wear and tear, and that it existed prior to September 30, 1943, the date when the scow entered Moran's service.

When the surveyors told the bargee on Cleary No. 54 about the leak, the latter, while somewhat resentful, notified libelant, who assured him that it would be taken care of.

The measures actually taken to repair the leak (October 24 and 25, 1943) were little short of ridiculous. The scow was lightened aft, to some extent. The bargee, using a table knife, then stuck some "cotton" in the seam alongside the starboard rake timber on the inside of the scow. A runner in the employ of libelant procured a rowboat and went to the stern of the scow. There he attempted to caulk the seams between the top four end planks on the starboard side. Probably some of these seams were under water while the runner attempted to drive oakum into them. The net result of all this was that the leak was not cured; indeed it was made worse, because the effect of stuffing cotton into

the inside seam near the rake timber was merely to divert the water leaking from the outside and cause it to run into the bilges. Moran was told nothing about this occurrence, and when the scow had discharged her cargo, she was, on Moran's orders, towed light to Pier 14, East River. There she was laden with 700 tons of dirt, and when this operation was completed, was hauled out and moored at the head of the pier. She was the off shore boat in a tier of three, two carfloats lying between her and the pier head. A baffling incident then occurred.

It is clear that sometime in the morning of October 28, 1943, the tier of which Cleary No. 54 was the off shore vessel broke adrift. It is also clear that Cleary No. 54, along with the carfloats, was picked up by a tug and moored at the head of Pier 16, and that in the interval no damage of any kind was sustained by Cleary No. 54. While the scow was adrift, two employees of libelant were on board, one of them a repairman. It seems that they did nothing but look around. Beyond that, the bargee of Cleary No. 54 was also on board the scow at the time.

It is at this point that the incident takes on a mysterious flavor. As soon as the scow had been resecured, her bargee began to make a series of telephone calls to libelant. According to his version of the matter, he did not like the berth and was anxious to have the scow moved. But I think there was more to it than that. I suspect that the bargee was worried more about the condition of the scow than he was about the condition of the berth.[3] Whether or not this suspicion is well founded (I make no finding on the point), the bargee after at least three telephone calls to his owners called Moran and asked to be taken away from the berth, according to his own version of the matter. Moran told him that he could not be moved until he was taken to Dyckman Street. Thereupon the bargee "put on his hat", as he says, and left the scow, never to return. Meanwhile, apparently while all these telephone calls were being made, one of the Cleary em-

---

[3] I base this in part upon his own statement (S. M. 403) that the captains of the adjacent carfloats told him "You are crazy to stay aboard that thing".

ployees aboard the scow, to whom I have previously referred, left a note in the hasp of the padlock on the bargee's cabin, requesting him to call his owners. This fact, as will be seen, is important.

On October 31st (the river being moderately rough) Cleary No. 54, in company with the scow Clifton Turner, was towed to Dyckman Street by the tug Dauntless No. 9. Cleary No. 54 was, on arrival, moored to the Dyckman Street dock with her bow down stream. Clifton Turner was moored off shore of Cleary No. 54 with her bow up stream. There is neither proof nor claim that up to this point Cleary No. 54 had sustained any damage, by collision or any other cause, while in the hands of Moran.

On November 1st at about 11:30 P.M. Clifton Turner was taken from her berth by a Moran tug. Since the object of the maneuver was to take Clifton Turner in a northerly direction, it can be seen that it was a fairly simple one. The tug merely procured the lines between Clifton Turner and Cleary No. 54 to be cast off, secured the usual lines to Clifton Turner, and then hauled the latter downstream for a short distance in order to avoid a bight of land which juts out at Dyckman Street to the northward of the berth where the scows were lying. The tug then went ahead with her tow and proceeded about her business. Shortly thereafter, another scow (Seaboard No. 9) was placed in the berth just vacated by Clifton Turner. It is the contention of the libelant that it was during this maneuver that Cleary No. 54 came by a hole later found in her starboard bow corner, and it is to this hole that libelant attributes the disaster. But all the probabilities are against this. It is almost certain that the hole in the starboard bow corner of Cleary No. 54 was caused when she careened on the morning following the shifting operation. A finding of fact to the contrary would require that believable evidence be arbitrarily rejected; moreover, such a finding could rest upon nothing but speculation.

At 11:30 P.M. on November 1, 1943, the bargee of Seaboard No. 9 noticed that Cleary No. 54 had a slight list to star-board. When he got up on the following morning, the list had increased to such an extent that he decided to slacken off his own lines. At this time he looked down Cleary No. 54's forward hatch and saw water coming in. Where it came from, he could not tell. He notified Moran and the Coast Guard. The note for Cleary No. 54's bargee was still in the hasp of the lock on his cabin door. But at about 9:30 A.M. Cleary No. 54 careened to starboard, dumped her cargo, jumped clear out of the water, and impaled herself on a bollard on the dock, at a point in the bottom near the port stern corner. Unquestionably Cleary No. 54 at this time received the hole in her starboard bow corner, and there is no causal connection between that hole and the disaster.

█ It will be borne in mind that there was no contractual relationship at any time between libelant and respondent embodying a "warranty" of seaworthiness. Moran, apparently, thought that Christie was either the owner or the chartered owner of the scow. But, as I have said, libelant elected either to treat Christie as a mere broker, or to by-pass any controversy between Christie and itself, and to sue only Moran, who, contract-wise, was a stranger. The libel, nevertheless, alleges that Cleary No. 54 was seaworthy when she went into Moran's service. And, regardless of the absence of any contractual relationship between libelant and respondent, libelant cannot succeed unless it sustains its burden of proof that on September 30, 1943, the scow was seaworthy. Libelant has not sustained that burden.

█ It elected to stand upon answers made by the respondent to interrogatories, which constituted admissions that between September 30, 1943, and November 2, 1943, Cleary No. 54 safely carried cargo on at least three trips. These answers it fortified at the trial by proof to the same effect elicited from Moran's dispatcher. But it is familiar learning that seaworthiness is not proved merely because a scow happened to carry cargo safely on occasions prior to the disaster. These trips may have been

nothing more than lucky accidents.[4] However, even supposing that such proof does make out at least a prima facie case, that case has been more than offset by abundant proof in the record that Cleary No. 54 had a leak of long standing in her starboard stern corner, a condition in no way attributable to the carelessness of the respondent, that this dangerous condition was dealt with by Cleary employees in a bungling way, and that in all human probability that leak was a competent producing cause of the disaster, accompanied as it was by the inexplicable conduct of the bargee of Cleary No. 54.

The bargee of Cleary No. 54, a servant of libelant, took french leave, as I have said, on October 28, 1943, and between that date and November 2, 1943, the time of the disaster, Cleary No. 54 was an orphan of the harbor. So far as the record discloses, she was never pumped out from the time that the bargee left her until she careened. Applying the formula suggested by Judge Learned Hand in United States v. Carroll Towing Co., 2 Cir., 1947, 159 F.2d 169, to me at least it seems beyond argument that this case is one where the absence of the bargee cannot be excused, making all due allowance for the fact that nobody expects a bargee to be a seaman.

There was controversy at the trial concerning the question whether the libelant, even in the absence of contractual relations between itself and respondent was entitled to the "presumption" flowing from the return in damaged condition of a scow in bail. I believe libelant would have the benefit of such a presumption if it proved, or made out a prima facie case, of delivery in good condition. I suspect that here the presumption ought not arise at all (because safe carriage of cargo prior to the disaster is not enough to warrant a rational inference of seaworthiness). But I may be wrong in this. Nevertheless, it makes no difference, because the proof in this case of unseaworthiness and laxity on the part of libelant's service as concurring proximate causes of the disaster is so strong that it manifestly cancels out and overcomes any presumption or rational inference of fault against respondent. This is to say nothing of the fact that respondent meticulously proved that all during the time Cleary No. 54 was in its service, it, the respondent, through its servants, was guilty of no fault of any kind in taking care of the scow.

There should be a decree for the respondent, dismissing the libel on the merits with costs.

I have filed findings of fact and conclusions of law.

---

[4] It is clear from the evidence of Cleary No. 54's bargee that prior to the Moran charter she was carrying very light loads (during the summer of 1943). Assuming that she came by the leak at her starboard stern corner during or prior to that time, this makes it quite probable that the caulking in the seams of the top four end planks in the starboard stern area had dried out during the summer. The carriage of three cargoes in safety can be accounted for on the hypothesis that the leaking area was never submerged, or that the leak was controlled. So that, under the circumstances of this case, the safe carriage of cargo prior to the disaster is, at best, a neutral fact, and here creates no inference of seaworthiness.