SWYGERT, Senior Circuit Judge,
dissenting.
The court today continues what it began in Roland Machinery v. Dresser Industries, 749 F.2d 380 (7th Cir.1984): a wholesale revision of the law of preliminary injunctions. In affirming the district court’s grant of a preliminary injunction, the court goes through the motions of evaluating the decision below according to the well-settled precepts of the law of injunctions, but affirms, in fact, on the basis of its independent evaluation of the case. In so doing this court, as in Roland, again transgresses the limits of its appellate authority.
I
Hospital Products Ltd. (“HPL”) is an Australian corporation engaged in the manufacture of surgical stapling products. HPL’s primary products are reusable stainless steel surgical staplers and disposable cartridges containing stainless steel staples. The stapling system apparently per *603 mits surgeons to close wounds in less time and with less blood loss than conventional sutures. HPL stapling systems are sold in the United States by its wholly-owned subsidiary Surgeons Choice, Inc. (“SCI”), a Delaware corporation.
American Hospital Supply (“AHS”), an Illinois corporation, is the world’s largest distributor of medical supplies. American V. Mueller (“AVM”) is a division of AHS. On July 27, 1982 AVM entered into an exclusive distribution agreement with HPL and SCI. The agreement provided, inter alia, that AVM would make guaranteed purchases of HPL products and required that AVM provide SCI with non-cancellable purchase orders ninety days in advance of delivery. Under the agreement AVM was obligated to purchase $12.8 million worth of HPL products in 1985.
Throughout the period of the agreement HPL was in need of fresh infusions of capital. Not surprisingly, AHS quickly became HPL’s largest creditor. On December 16, 1982 AHS agreed to invest $6 million in HPL through the purchase of a convertible debenture. The debenture was due in 1988. On May 25, 1983 AHS loaned an additional $3.8 million to HPL. The parties disagree as to the repayment date of the loan. The relationship between HPL and AHS was not an ordinary supplier/distributor relationship. Because of the financial commitments AHS had made to HPL the American company exercised an extraordinary degree of control over HPL operations.
It is fair to say that the relationship between HPL and AHS throughout the period of the distribution agreement was not always harmonious. However, the events leading to the present appeal began on February 28, 1985 when HPL advised AHS that it was in a position to distribute more than $1 million to creditors. AHS exercised its rights under its loan agreements to prevent HPL from making the distributions. In March 1985 AHS advised HPL to take no further action with respect to a planned public offering until the parties’ meeting in April.
Relations between the two companies continued to deteriorate and on April 30, 1985 AHS told HPL that it intended to acquire HPL through a “scheme of arrangement” or put HPL into receivership. The scheme of arrangement was a takeover plan proposed by AHS under which HPL creditors would receive 34% of their debts and shareholders would receive 9% of the market value of their shares. AHS cancelled $7.3 million in outstanding orders, refused to pay $3.4 million for products already shipped, announced its intention to return $3.1 million of products already purchased, and demanded repayment of the $3.8 million loan. On April 30, 1985 AHS sued HPL for breach of the distribution agreement.
Under the terms of the distribution agreement, if AHS desired to terminate the agreement it was required to furnish written notice ninety days prior to September 1, 1985 (June 3, 1985). On June 3, 1985 HPL requested that AHS confirm whether it intended to renew the distribution agreement. AHS responded the same day by observing that since notice had not been given the agreement was consequently renewed. AHS gave these assurances even though it had already filed suit against HPL claiming that the same agreement had already been breached. On June 4 HPL informed AHS that in its opinion AHS’s conduct and the April 30, 1985 meeting constituted a repudiation of the distribution agreement. On June 5, 1985 and then again on June 7, 1985 AHS repeated its belief that the agreement remained in full force. Nevertheless, on June 7, 1985 SCI sent a Mailgram to AVM’s customers stating that AVM was no longer authorized to distribute SCI’s stapling products. In the same Mailgram HPL announced the commencement of a direct sales campaign of its products.
On June 18, 1985 AHS moved for a temporary restraining order prohibiting HPL from selling its products directly in the United States. On June 19, 1985 the United States District Court for the Northern District of Illinois granted the restraining *604 order. HPL thereupon terminated its employees and a receiver was appointed on June 25, 1985. On July 2 and 3, 1985 a preliminary injunction hearing was held. The district court granted AHS’s motion for a preliminary injunction on July 8,1985.
II
Parties seeking a preliminary injunction must meet four requirements. They must show that: (1) they have no adequate remedy at law and will suffer irreparable harm if the relief is not granted; (2) the irreparable harm they would suffer outweighs the irreparable harm defendants would suffer from an injunction; (3) they have some likelihood of success on the merits; and (4) the injunction would not disserve the public interest. Palmer v. City of Chicago, 755 F.2d 560, 576 (7th Cir.1985); Godinez v. Lane, 733 F.2d 1250, 1257 (7th Cir.1984). Adequate Legal Remedy and Irreparable Harm
In granting the preliminary injunction the district court found that AHS had no adequate remedy at law and would suffer irreparable harm without a preliminary injunction. The district court found that the June 7 HPL Mailgram harmed AHS and AVM “significantly,” and further found that the evidence was “clear” that AVM’s customers refused to buy the millions of dollars of SCI products which AVM had on hand as a result of being informed that AVM was no longer an authorized distributor.
The district court ignored the fact that AHS did not, and indeed could not, prove a significant loss of sales. AHS’s 1984 Annual Report listed sales of just under $3.5 billion. Even if all $12.8 million of HPL products AHS had agreed to purchase in 1985 were rendered unmarketable by the direct sales campaign lost sales would represent less than 0.4% of AHS’s total sales. Of course, the mere fact that AHS is a giant corporation with enormous annual sales does not preclude a finding that AHS will be irreparably harmed by HPL’s actions. At the same time, however, we cannot overlook the relative insignificance of HPL products to AHS revenues. Moreover, AHS submitted no evidence that the Mailgram had led to any actual loss of sales. In addition, at oral argument AHS admitted that if it later won on the merits it would be able to return all HPL inventory.
The majority concludes that a threat of irreparable harm to AHS was established “although the dollar amount of that harm is not known with any precision and we hesitate to call it greal.” The majority, however, does not rely on the district court’s findings. Instead, the court hypothesizes a series of imagined harms that might have, but did not, furnish the basis for the grant of the preliminary injunction. The court suggests that the Mailgram “might have impaired American Hospital Supply’s goodwill.” There is no evidence of this in the record. The district court merely made a conclusory finding that AHS’s alleged loss of goodwill would, if proven, be difficult to calculate. The majority suggests that the “suddenness of the termination and the urgent mode of announcement might have made the dealers think that American Hospital Supply must have engaged in unethical or unreasonable conduct.” Again, there is no support for this statement in the record and even the majority concedes its theory is “speculative.” The majority further suggests that the Mailgram jeopardized AHS’s investment “because dealers might be reluctant to buy Hospital Products’ goods from American Hospital Supply, not wanting to become enmeshed in a legal dispute between it and its supplier or perhaps even fearing that there might be some defect in the particular items being sold by American Hospital Supply.” There is, again, simply no indication in the record of such a concern on the part of anyone. The .task of appellate courts is simply to review the findings of the district courts and not to construct new findings of fact as they see fit.
In addition, the sending of the Mailgram was motivated, in part, by AHS’s actions in bringing the breach of contract suit on *605 April 30, 1985. HPL terminated AHS only after AHS had filed suit. AHS can thus hardly have been surprised when HPL proceeded to act as if the agreement had already been breached.
Both the district court and the majority assert that what made the threatened loss to AHS irreparable was HPL’s insolvency. The evidence, however, does not show that HPL was on the “brink of insolvency” before the alleged failure of AHS to fulfill its contractual obligations. At worst, the evidence indicates that HPL was a profitable, albeit highly leveraged, concern. Just what brought about the financial collapse of HPL is the essence of the underlying dispute between the parties. The district court’s determination that HPL’s insolvency was irrelevant is thus a perfect example of question-begging. The insolvency dispute will be more effectively resolved within the framework of the ongoing bankruptcy proceedings. A preliminary injunction hearing in the district court is a clumsy vehicle for resolving factual disputes. If it later develops that HPL’s bankruptcy was due, in significant part, to AHS’s actions, AHS will have succeeded in benefitting from its own misconduct. Moreover, it is not clear to what extent the granting of the preliminary injunction itself insured that HPL would become insolvent. Finally, even if I were to concede that HPL’s imminent insolvency rendered the recovery of damages questionable, Roland requires that a party moving for a preliminary injunction establish both a threat of irreparable harm and the lack of an adequate remedy at law. Even if the district court established the lack of an adequate remedy at law it cannot be permitted to bootstrap that finding into a finding of a threat of irreparable harm as well. Irreparable harm and lack of an adequate remedy at law are separate but equally necessary components of the Roland test.

Balancing of Harms

The district court found that the balance of harms weighed in AHS’s favor. The district court acknowledged that the injunction might drive HPL out of business, but concluded that “defendants may not excuse their unlawful actions by their actual or threatened insolvency.” The district court adopted by reference its previous analysis of the issue as set forth in the June 19, 1985 memorandum order granting the temporary restraining order. The June 19 order conceded that the harm to HPL caused by the injunction would be “significant.” Nevertheless, it concluded the balance of harms weighed in AHS’s favor for four reasons: (1) insolvency is no shield for unlawful conduct; (2) HPL owes its existence to the financial commitments of AHS; (3) the bond it required AHS to post would adequately protect HPL’s interests; and (4) AHS has more than enough resources to compensate HPL in damages should it later be determined that the injunction was erroneously granted.
The district court’s findings are an inadequate basis for injunctive relief. The court rejected HPL’s contention that its probable bankruptcy in the event the injunction should issue was a factor to be considered in weighing the balance of harms. The district court erred in rejecting the importance of HPL’s insolvency. The majority opinion states clearly “that the effect of a preliminary injunction in precipitating insolvency is a factor arguing against the grant of the injunction ... reflection on this overlooked point might conceivably persuade the district judge to grant a motion to dissolve the preliminary injunction, should such a motion be made, as it can be at any time.” The district court, of course, did not merely “overlook the point”; it drew a clearly erroneous conclusion of law. That conclusion was a crucial aspect of its decision to grant the preliminary injunction. The majority’s decision, in light of its recognition of the district court’s error, is inexplicable.
The second factor mentioned in the district court’s June 19 order was that HPL owed its continuing existence to the financial commitments of AHS. It is not clear what the district court intended to imply by this remark except perhaps that AHS had acquired some vague equity rights by its *606 decision to loan HPL money. This is clearly an improper basis upon which to grant a preliminary injunction. The moral obligations incurred by HPL because of the loans from AHS are not at issue here. The majority does not suggest why this particular finding of the district court is legally significant, but elsewhere states its belief, with which I agree, that AHS provided financial assistance to HPL “not out of altruism ... but because it liked Hospital Products’ product.” AHS should derive no benefits because of a previous business decision to loan HPL money. Like any creditor AHS evaluated the risks involved in making the loans and judged them to be manageable. The fact that those loans may have turned out to be unwise is irrelevant. Thus, the second purported basis for the district court’s order granting the preliminary injunction is also without justification.
In granting the temporary restraining order and the preliminary injunction the district court also relied on the capacity of AHS’s posted bond and AHS’s vast financial resources to compensate HPL for any harm resulting from the issuance of the injunction. These claims of the district court are discussed at length in the majority opinion and I will not repeat that discussion here. I agree with the majority, however, that the district court’s reasoning in this matter is “not entirely satisfactory.” As the majority points out the injunction bond and HPL’s counterclaim for damages will not be an adequate source of compensation for the loss of a going business concern. HPL was one of only two manufacturers of surgical stapling products in the non-communist world. The company had acquired an international reputation in the surgical supply industry. The grant of the preliminary injunction may have helped destroy a company whose value cannot be measured by an injunction bond. To paraphrase Judge Friendly: HPL wants to make surgical supplies, not to live on the income from a damages award. Semmes Motors v. Ford Motor Co., 429 F.2d 1197, 1205 (2d Cir.1970).
The majority cannot decide whether the district court was correct in concluding that the balance of harms weighed in AHS’s favor or whether no clear balance of harms was shown. The majority merely concludes tht in either event the injunction was properly issued. With all due respect the majority’s treatment of the district court’s findings is too cavalier. If AHS can establish only a parity of harms its right to injunctive relief and its likelihood of ultimate success on the merits is seriously jeopardized. See discussion infra at 607. We cannot affirm a district court’s decision to grant an injunction when substantial questions remain concerning the district court’s assessment of one of the four parts of the traditional preliminary injunction test.[1]

Likelihood of Success on the Merits

The district court also found that AHS and AVM have “some likelihood” of succeeding on the merits. This finding was based on the district court’s belief that HPL’s conduct in sending the June 7 Mail-gram constituted a breach of the distribution agreement. HPL contends that the mailgram was justified because by June 7 AHS had already breached and repudiated the distribution agreement. A party repudiates a contract when there is “a positive and unequivocal manifestation of intention that the party will not render the promised performance when the time fixed in the contract arrives.” B & C Electric v. Pullman Bank & Trust, 96 Ill.App.3d 321, 328, 51 Ill.Dec. 698, 421 N.E.2d 206 (1st Dist. 1981). The district court found no evidence of an intention to repudiate the agreement. It is true that AHS, on several occasions, said the distribution agreement was in full force and that it would comply with its contractual obligations. The district court relied on these representations in making its preliminary assessment that HPL, and not AHS, breached the agreement. Speaking with great respect, I believe the district *607 court was clearly wrong to have placed so much reliance on what AHS might have said about the agreement. A party that intends to breach a contract is not likely to admit to the contemplated breach beforehand.
The district court should have more closely examined AHS’s conduct. “Anticipatory breach is not founded only upon the spoken words of the breaching party. Were this so, the right to action would founder ineffectively upon the false or evasive verbiage of the wrongdoer.” To-briner v. Mayfair Extension, Inc., 250 F.Supp. 614, 617 (D.D.C.1966), aff’d sub nom. Luxemberg v. Mayfair Extension, Inc., 382 F.2d 475 (D.C.Cir.1967). AHS failed to pay $3.4 million in receivables for products shipped prior to April 30, 1985. AHS refused to accept delivery on $7.3 million in non-cancellable orders. HPL presented into evidence several documents indicating AHS’s desire to alter or terminate its relationship with HPL. AHS brought a breach of contract suit against HPL one month before the fateful Mail-gram. These actions go to the very heart of the question of whether there was an anticipatory breach of the distribution agreement. The district court was simply wrong to characterize HPL’s allegations as “differences of opinion over the interpretation of an agreement.”
The majority’s review of this aspect of the district court’s opinion misses the point entirely. The majority, after briefly and inconclusively discussing the merits of HPL’s anticipatory breach claim, abruptly abandons its analysis, characterizing the dispute as “legal badminton.” In order to affirm the decision below the majority merely concludes that the “able and experienced” district judge was on “solid ground” in resolving the legal uncertainty in AHS’s favor. But whether the distribution agreement in question was breached is clearly a legal question courts of appeals need not refrain from answering. We owe deference to the factual findings, not the legal conclusions, of district courts. In this case the majority affirms the district court’s ultimate finding that AHS established some likelihood of success on the merits while simultaneously expressing serious reservations regarding the district court’s discussion of the merits of the crucial contract dispute.
The district court was correct in stating that Roland requires a district judge ruling on a motion for a preliminary injunction to find that the movant has shown “some likelihood of success” on the merits.[2] I have indicated my belief that the district court was wrong in finding that the balance of harms weighed in AHS’s favor. At most, the record supports a finding of a parity of harms. The majority does not disagree with this assessment. Under Roland, when the moving party has shown only a parity of harms, the district court must apply a stricter standard than “some likelihood of success.” Roland mandates that when “there is no clear balance of hardships in favor of the injunction” the moving party “must show that it is more likely than not to win.” Id. at 392. Only then would the error of denying AHS a preliminary injunction should it later win on the merits be more costly than the error of granting the injunction should AHS later lose on the merits. Id. Because the district court clearly erred in finding that the balance of harms weighed in AHS’s favor, the district court necessarily compounded its error by failing to apply the stricter standard of “more likely than not to win” required when only a parity of harms has been shown. AHS has not shown that it is more likely than not' to ultimately prevail on the merits of this dispute. The contract issues of this case are obviously too close to call. The district court’s finding that *608 AHS had shown some likelihood of success on the merits applied an incorrect legal standard and constitutes reversible error.
To recapitulate: the district court found that AHS had no adequate remedy at law and would suffer irreparable harm without an injunction. The majority agrees, but only after making new findings of fact not supported in the record. The district court found that the balance of harms weighed in AHS’s favor. The majority’s position on this point is unclear, but ultimately it decides that any error was harmless. The district court found that AHS had some likelihood of success on the merits. The majority agrees, but with apparent reluctance. It would appear that in this circuit, despite vigorous protestations to the contrary, the standard of review of the grant or denial of a preliminary injunction is effectively de novo. When reviewing a grant or denial of an injunction, this court will independently evaluate the evidence. If our evaluation agrees with that of the district court, we will affirm. If our evaluation disagrees, we will reverse.
The majority twice attempts to excuse the inadequacy of the district court’s findings in this case by reminding the reader of the haste with which a judge requested to issue a preliminary injunction must act. As a former district judge I am well aware of the extraordinary responsibilities of the district courts in granting or denying preliminary injunctions. But these responsibilities cannot be used to justify the erroneous issuance of an injunction. Fed.R.Civ.P. 65(d) requires that an order granting an injunction “shall set forth the reasons for its issuance.” That requirement is for the benefit of both the reviewing court and the party enjoined. Small v. Kiley, 567 F.2d 163, 164 (2d Cir.1977). From what appears in the record there is simply no basis upon which the district court could have made the requisite findings required by this court’s governing law of injunctions. Recently, we have been far less deferential to the difficult choices made by district courts in deciding whether to issue an injunction. See, e.g., McCall-Bey v. Franzen, 777 F.2d 1178 (7th Cir.1985). In my view the district court was affirmed because the result it reached met with the approval of the majority.
This summary of the majority’s decision may seem harsh, and so in order to demonstrate the accuracy of my criticism I have attached, as an appendix to this dissent, the opinions of the district court in this case.
III
I would have preferred to avoid commenting on the majority’s attempt to reduce the well-developed and complex law of preliminary injunctions to a “simple” mathematical formula. But because of the potentially far-reaching and baneful consequences of today’s decision, I must regretfully voice my concerns.
Henceforth, the district courts of this circuit should grant a preliminary injunction if, “but only if,” P x HP > (1 — P) x H<¡: where P is the probability that denial of the injunction would be an error; where Ht> is the harm to the plaintiff if the injunction is denied; and where Hu is the harm to defendant if the injunction is granted.
The majority describes its formula as a procedural counterpart to Judge Hand’s negligence formula first appearing in United States v. Carroll Towing, 159 F.2d 169, 173 (2d Cir.1947). Carroll Towing was an admiralty case in which a shipowner’s duty to provide against injuries resulting from the breaking of a vessel’s moorings was expressed in algebraic terms. In Hand’s formula the liability of the shipowner depends on whether B < PL, where P is the probability that the ship will break away; where L is the gravity of the resulting injury if she does; and where B is the burden of adequate precautions. Various attempts have been made to apply the Hand formula, or some derivation of it, to areas other than negligence. Professor Kronman, for instance, now at the Yale Law School, has attempted to apply the balancing standard of Carroll Towing to governmental claims that information is exempt from disclosure under Exemption 6 of *609 the Freedom of Information Act. 5 U.S.C. § 552(b)(6). Kronman, The Privacy Exemption to the Freedom of Information Act, IX(4)-J. Legal Stud. 727 (1980); see also Washington Post v. United States Department of Health, 690 F.2d 252, 276 (D.C.Cir.1982) (Tamm, J., dissenting). Most courts, however, have continued to view the Carroll Towing opinion as a negligence formula. See, e.g., Complaint of Paducah Towing, 692 F.2d 412 (6th Cir.1982); Maine Yankee Atomic v. NLRB, 624 F.2d 347 (1st Cir.1980). In recent years the Carroll Towing opinion has undergone a renewed popularity in this circuit. Llaguno v. Mingey, 763 F.2d 1560, 1564 (7th Cir.1985); United States Fidelity & Guaranty v. Jadranska Slobodna Plovidba, 683 F.2d 1022, 1026 (7th Cir.1982); Evra Corp. v. Swiss Bank Corp., 673 F.2d 951, 958 (7th Cir.1982). My quarrel, however, is not with Carroll Towing but rather with the majority’s attempt today to create its equitable analogue. A quantitative approach may be an appropriate and useful i/heuristic device in determining negligence in tort cases, but it has limited value in determining whether a preliminary injunction should issue. Proceedings in equity and cases sounding in tort demand entirely different responses of a district judge. The judgment of the district judge in a tort case must be definite; the judgment of the district judge in an injunction proceeding cannot, by its very nature, be as definite. The judgment of a district judge in an injunction proceeding must be flexible and discretionary — within the bounds of the now settled four-prong test.
I question the necessity and the wisdom of the court’s adoption of a mathematical formula as the governing law of preliminary injunctions. The majority claims that its formula is merely a distillation of the traditional four-prong test. But if nothing is added to the substantive law, why bother? The standard four-prong test for determining whether a preliminary injunction should issue has survived for so many years because it has proven to be a workable summation of the myriad factors a district court must consider in deciding whether to grant an injunction. The test articulated in Technical Publishing v. Lebhar-Friedman, 729 F.2d 1136, 1138 (7th Cir.1984), and in countless other cases, may not exhibit the “precision” the majority seems to demand, but such “precision” is antithetical to the underlying principles of injunctive relief. Equity, as the majority concedes, involves the assessment of factors that cannot be quantified. A district court faced with the task of deciding whether to issue a preliminary injunction must to some extent, the majority concedes, rely on the “feel” of the case. See generally my discussion in Roland, 749 F.2d at 396. The majority’s formula will not assist the district courts in their assessment of this aspect of the decision to grant a preliminary injunction. The traditional element of discretion residing in the decision of a trial court to grant a preliminary injunction has been all but eliminated by today’s decision.
Ironically, the majority never attempts to assign a numerical value to the variables of its own formula. We are never told how to measure P or HP or Hd. I believe, and the majority appears to concede, that a numerical value could never be assigned to these variables. Who can say, for instance, what exactly the probability is that the granting of the injunction was an error? How then will the majority’s formula ease in a meaningful way the responsibilities of the district courts? Judges asked to issue a preliminary injunction must, in large part, rely on their own judgment, not on mathematical quanta.
We must, of course, be mindful not to vest too much imprecision in the preliminary injunction standard, for law implies a system of known and generally applicable rules. See Fiss & Rendleman, Injunctions 104 (2d ed. 1984). The existing four-prong test, however, represents the historical balance struck by the courts between the rigidity of law and the flexibility of equity.
The majority disavows any effort to force the district courts into a “quantitative straitjacket,” but I suspect that today’s decision may lead to just that. District *610 judges operate under enormous pressure to be decisive and precise. Much rides on their smallest decisions. Like a Homeric Siren the majority’s formula offers a seductive but deceptive security. Moreover, the majority’s formula invites members of the Bar to dust off their calculators and dress their arguments in quantitative clothing. The resulting spectacle will perhaps be entertaining, but I do not envy the district courts of this circuit and I am not proud of the task we have given them.
I would reverse the district court’s issuance of the preliminary injunction.[3]
APPENDIX
American Hospital Supply Corporation and American v. Mueller, a division of American Hospital Supply Corporation, Plaintiffs,
v.
Hospital Products Limited and Surgeons Choice, Inc., Defendants.
No. 85 C 4304
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
MEMORANDUM OPINION AND ORDER
Marvin E. Aspen, District Judge:
In September of 1982, plaintiff American Hospital Supply Corporation (“AHS”), through its division American V. Mueller (“AVM”), entered into an exclusive distribution agreement with defendants Hospital Products Limited (“HPL”) and HPL’s wholly owned subsidiary Surgeons Choice, Inc. (“SCI”) for the distribution throughout the United States of surgical stapling products manufactured by HPL and SCI. Plaintiffs filed this action on April 30, 1985, alleging breaches of the parties’ distribution agreements and other contracts. Based on defendants’ purported misconduct after the initiation of this suit, plaintiffs filed a supplement to their complaint and moved for temporary and preliminary injunctive relief. On June 19, 1985, the Court granted plaintiffs’ motion for a temporary restraining order (“TRO”). The parties have since filed more extensive briefs and have presented voluminous evidence to the Court in a hearing held on July 2 and 3. For the reasons set forth below, plaintiffs’ motion for a preliminary injunction is granted.
As noted in the Court’s June 19, 1985 memorandum order, plaintiffs must meet four requirements to obtain preliminary in-junctive relief. They must show that: (1) they have no adequate remedy at law and will suffer irreparable harm if the relief is not granted; (2) the irreparable harm they would suffer outweighs the irreparable harm defendants would suffer from an injunction; (3) they have some likelihood of success on the merits; and (4) the injunction would not disserve the “public interest”. See Roland Machinery Co. v. Dresser Industries, 749 F.2d 380, 386-88 (7th Cir.1984).
Plaintiffs have demonstrated that they have no adequat^ remedy at law and would suffer irreparable harm without a preliminary injunction. On June 11, 1985, SCI sent a mailgram to AVM’s customers stating that AVM was no longer authorized to distribute SCI’s stapling products. In granting plaintiffs’ motion for a TRO, the Court observed that this mailgram and defendants’ subsequent actions appeared to cut plaintiffs out of the staples market “altogether,” in breach of the parties’ exclusive distributorship agreement. It now appears that plaintiffs were not excluded from the market completely, as AHS had recently developed its own line of certain stapling products. Nevertheless, the mail-gram harmed plaintiffs significantly. The evidence is clear that when the mailgram *611 was sent AVM had on hand many millions of dollars of SCI products, which AVM’s customers refused to buy after being told by SCI that AVM was no longer authorized to distribute the products. Damages cannot adequately compensate plaintiffs for two reasons: (1) HPL and SCI may well be solvent,[1] and thus unable to respond in damages; and (2) plaintiffs’ lost profits, as well as the considerable damage to their reputations and goodwill, are extremely difficult to calculate. Roland, 749 F.2d at 386; see also Reinders Brothers, Inc. v. Rain Bird Eastern Sales Corp., 627 F.2d 44, 53 (7th Cir.1980).
Plaintiffs also have some likelihood of succeeding on the merits. By its own terms, the distribution agreement (as amended on May 25, 1983) was automatically renewed every year unless terminated by AVM. Agreement ¶ 3; Amendment No. 2 116. Notwithstanding this provision, HPL and SCI wrote to AVM on June 3, 1985, inquiring as to plaintiffs’ plans to renew the agreement. AVM responded the same day, pointing out the automatic renewal provision of the distribution agreement and confirming plaintiffs’ intention to be bound by its terms. In spite of this, defendants unilaterally terminated the agreement and sent the June 11 mailgram to AVM’s customers, offering to sell them SCI’s stapling products directly. This constitutes a breach of the distribution agreement. See, e.g., Agreement ¶ ¶ 5(c), 8.
Defendants argue that they acted properly in sending the mailgram because AHS and AVM already had repudiated the distribution agreement through various actions. Thus, defendants contend, their direct sales campaign was a reasonable response designed to mitigate damages caused by plaintiffs’ breach of contract. However, to constitute a renunciation which may be treated as an anticipatory breach “there must be a positive and unequivocal manifestation of intention that the party will not render the promised performance when the time fixed in the contract arrives.” B & C Electric, Inc. v. Pullman Bank and Trust Co., 96 Ill.App.3d 321, 328 [51 Ill.Dec. 698, 703], 421 N.E.2d 206, 211 (1st Dist.1981). AHS never clearly or unequivocally indicated that it did not intend to be bound by the terms of the distribution agreement. To the contrary, AHS consistently stated that the distribution agreement was in full force and that it would comply with its contractual obligations. AHS never gave the notice of termination required to avoid the automatic renewal of the distribution agreement. Moreover, on June 3 and 5 AHS responded to two HPL letters by affirming and then reaffirming its belief that it was bound by the agreement.
To be sure, the parties have disagreed in their interpretation of the distribution agreement. For example, they have argued about AHS’s right to cancel purchase orders under the agreement, AHS’s ability to set-off the amount due to HPL and SCI for products shipped against payments due under a loan agreement, and whether products developed by AHS compete with or actually complement defendants’ products.[2] However, differences of opinion over the interpretation of an agreement do not by themselves constitute an anticipatory breach; they must be accompanied by some indication that the party would refuse to abide by any interpretation of the agreement but his own. Farwell Construction Co. v. Ticktin, 84 Ill.App.3d 791, 800-01 [39 Ill.Dec. 916, 923-24], 405 N.E.2d 1051, 1058-59 (1st Dist.1980). We conclude that there is at least some likelihood that plaintiffs will succeed at trial in showing that *612 they did not repudiate the distribution agreement and therefore that defendants’ direct sales campaign breached the agreement.[3]
The third factor to be considered, the public interest, is remotely involved and will be affected very little by this suit. The public interest does not work significantly for or against either side. Thus, it will not be frustrated by the preliminary injunction sought by plaintiffs.
Finally, we find that the balance of harms weighs in plaintiffs’ favor. Nothing presented to the Court since the TRO hearing has swayed us from the analysis of this question set forth in the June 19 memorandum order. We are mindful that HPL is in receivership and may well be driven out of business by a preliminary injunction. However, defendants may not excuse their unlawful actions by their actual or threatened insolvency.
Accordingly, defendants are preliminarily enjoined from:
(1) selling products in the United States in violation of plaintiffs’ exclusive rights under the Distribution Agreement.
(2) taking further action in advising plaintiffs’ customers or anyone else that plaintiffs are not the exclusive authorized distributor of defendants’ products;
(3) appointing any additional distributors to distribute their products in the United States; and
(4) taking any action in derogation of plaintiffs’ rights under the Distribution Agreement.
In addition, defendants are ordered to transmit corrective notices to all those sent the June 7, 1985 mailgram, stating that ÁYM is the exclusive authorized distributor of SCI stapling products, through a second mailgram on or before July 12, 1985. The $5 million bond required in our June 19 order shall remain posted pending trial of this suit. A status hearing is set for September 13, 1985, at 10:00 a.m. It is so ordered.
/s/ Marvin E. Aspen
United States District Judge
DATED 7/8/85
MEMORANDUM ORDER
Marvin E. Aspen, District Judge:
After careful consideration of the papers filed by the parties and the fine arguments made in open court yesterday morning, the Court grants plaintiffs’ motion for a temporary restraining order (“TRO”).
The Seventh Circuit recently recast the equitable standards for emergency injunc-tive relief. To obtain relief the plaintiffs must show that (1) they have no adequate remedy at law and will suffer irreparable harm if the relief is not granted; (2) the irreparable harm they would suffer outweighs the irreparable harm defendant would suffer if the injunction is not granted; (3) they have some likelihood of success on the merits; and (4) the desired injunction would not frustrate the “public interest.” See Roland Machinery Co. v. Dresser Industries, 749 F.2d 380, 386-88 (7th Cir.1984); United States v. Board of Education of Chicago, [610 F.Supp. 702, 705,] No. 80 C 5124, slip op. at 4-5 (N.D.Ill. June 4, 1985) (Aspen, J.).
Plaintiffs have fairly easily met three of the four requirements. First, we are convinced that they have no adequate remedy at law and would suffer irreparable harm absent a TRO. Defendants’ mailgram of June 11 to plaintiffs’ customers and their subsequent actions have cut plaintiff out of the “staples” market altogether, apparently in breach of the exclusive distributorship agreement. Damages cannot adequately compensate plaintiffs. Defendants are *613 clearly on the brink of insolvency, if not insolvent already. See Roland, 749 F.2d at 386. This fact distinguishes the cases defendants rely upon, such as Lafayette Beverage Distributors v. Anheuser-Busch Co., 545 F.Supp. 1137, 1151 (N.D.Ill.1982). Moreover, the large losses caused by defendants’ devastation of plaintiffs’ market are not easily calculated and neither is the loss to the plaintiffs’ good will. Roland, 749 F.2d at 386.
Second, plaintiffs have some likelihood of success on the merits. At this point the parties are accusing each other of breaches, and it is unclear who will prevail. But the pending motion focuses only on defendants’ conduct since June 7, 1985, and plaintiffs have at minimum “some likelihood” of showing that this conduct was unlawful. Even though on June 3,1985, plaintiffs told defendants that they intended to renew the distribution agreement (which defendants had asked them to confirm), defendants unilaterally terminated the agreement. On June 11, 1985, they sent a mailgram of plaintiffs’ customers, telling them that plaintiffs were no longer authorized to distribute defendants’ staples. Defendants are now marketing their products at much lower prices, presumably to raise quick cash for their emergency. This conduct appears to breach the distribution agreement, see Agreement ¶ 8, and to have caused plaintiffs’ irreparable harm.
Third, the “public interest” appears only indirectly related to this suit and does not work significantly for or against either side. Thus, it does not counsel against issuance of a TRO.
Defendants’ most significant argument is that the balance of harms weighs heavily in their favor. In approaching the “balance” issue, we must apply a sliding scale. “The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.” Roland, 749 F.2d at 387. We think plaintiffs have a substantial chance of showing that defendants’ conduct since June 3, 1985, has been unlawful. Thus, the balance need not weigh strongly in their favor.
Still, the harm to defendants will be significant. Plaintiffs are huge, their business with defendants adding up to only about one percent of their total. In contrast, defendants do ninety-nine percent of their business with plaintiffs. A TRO might drive defendants out of business. We have sympathy for defendants’ predicament, as expressed in their affidavit, but nevertheless believe that it does not counsel against issuing a TRO. First, under defendants’ logic, they can destroy plaintiffs’ market without fear of injunctive relief simply because they can show that enjoining their unlawful conduct could put them out of business. We cannot allow defendants to use their insolvency to so shield their allegedly unlawful conduct. Cf. Horn Abbot v. Sarsaparilla Ltd., 601 F.Supp. 360, 369-70 (N.D.Ill.1984) (Aspen, J.). Second, it appears likely that defendants, in large part, owe their present existence to plaintiffs who have loaned millions to defendants to prevent bankruptcy. Third, we think that the bond we set below could well stave off disaster until a hearing on a preliminary injunction is soon held. Finally, to the extent, if at all, plaintiffs have unlawfully harmed defendants, they have more than enough resources to compensate defendants in damages.
For the foregoing reasons, a TRO should issue, the terms of which are set forth below. Under Fed.R.Civ.P. 65(c), the Court may set as bond a sum it deems proper to make defendants whole in case they turn out to have been unlawfully enjoined. According to defendants’ affidavit, plaintiffs have ordered and either failed to pay for or cancelled about $5 million worth of goods. We will set a bond in that amount, which should more than adequately protect defendants’ interests pending a hearing on a preliminary injunction. Defendants shall file a memorandum opposing plaintiffs’ preliminary injunction motion on or before June 26, 1985. Plaintiffs shall reply by July 1, 1985. A preliminary injunction hearing will be held July 2, 1985, at 11:00 a.m. It is so ordered. This schedule as *614 well as the TRO can be extended, of course, if the parties so agree or if the parties resume their negotiations and reach a partial or complete settlement.
In sum, defendants are temporarily restrained from:
(1) selling products in the United States in violation of plaintiffs’ exclusive rights under the Distribution Agreement;
(2) taking further action in advising plaintiffs’ customers or anyone else that plaintiffs are not the exclusive authorized distributor of defendants’ products;
(3) from appointing any additional distributors to distribute their products in the United States; and
(4) from taking any action in derogation of plaintiffs’ rights under the Distribution Agreement.
This TRO shall remain in effect for twenty days, that is, until July 9, 1985, unless the parties agree to extend it longer. See Horn Abbot, 601 F.Supp. at 370 n. 12 (where TRO is issued after notice and hearing, court'may impose it for twenty days pending prompt hearing on preliminary injunction within that time). Plaintiffs shall post a bond of $5 million by Friday, June 21, 1985. It is so ordered.
/s/ Marvin E. Aspen
United States District Judge
DATED 6/19/85

. In my opinion the balance of harms weighed in HPL’s favor if for no other reason than the grant of the preliminary injunction was certain to precipitate HPL’s slide into bankruptcy.

. I expressed my reservations concerning this court’s recent reevaluation of the preliminary injunction standard in my dissenting opinion in Roland, 749 F.2d at 396. Events since have only reinforced my belief that the majority's discussion in Roland of the preliminary injunction standard represents a "fundamental misunderstanding of the role of preliminary injunctive relief in our legal system and the role of the district courts in dispensing that relief.” Id. at 397.

. HPL retains the option of returning to the district judge and moving for a modification of the injunction on the basis of bankruptcy. Having sent the corrective Mailgram HPL has now allowed AHS to sell its inventory of HPL products. In return HPL should be permitted to sell its product in the United States until the contract dispute is resolved.

. Defendants assert that plaintiffs cannot rely on HPL’s insolvency because HPL’s dire financial situation has been caused solely by AHS's failure to fulfill its contractual obligations. We disagree. This evidence shows that HPL was "on the brink of insolvency” long before the conduct of which defendants complain occurred.

. The parties also presented conflicting testimonial evidence at the preliminary injunction hearing as to whether AHS had ever stated that it would refuse to buy more products from defendants.

. Most of the evidence offered by defendants at the hearing on July 2 and 3 was not directly related to the issue of repudiation, but rather purported to support several of the eleven counts in defendants’ counterclaim against plaintiffs. This evidence was not relevant to the narrow question before the Court at the hearing on the motion for preliminary injunctive relief: whether defendants should be enjoined from selling surgical stapling products contrary to the parties’ exclusive distribution agreement.